**UNITED STATES of America**

v.

**Ralph GINZBURG, Documentary Books, Inc., Eros Magazine, Inc., Liaison News Letter, Inc.**

**Crim. A. No. 21367.**

United States District Court
E. D. Pennsylvania.
Nov. 21, 1963.

Drew J. T. O'Keefe, U. S. Atty., J. Shane Creamer, Isaac S. Garb, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

Norman A. Oshtry, Philadelphia, Pa., David I. Shapiro, and Sidney Dickstein, Washington, D. C., for defendants.

Murry Powlen, Philadelphia, Pa., for American Civil Liberties Union, Amicus Curiae.

BODY, District Judge.

The following Special Findings of Fact which were previously entered by the Court on August 6, 1963 are hereby incorporated into and made a part of this opinion:

## SPECIAL FINDINGS OF FACT

1. The stipulation entered into by counsel for defendants and counsel for the government, and approved by this Court, dated May 8, 1963, filed the same day (Clerk's File, Document Number 12) is hereby incorporated in its entirety as a finding of this Court.

2. The mailing of "Liaison" Vol. 1, No. 1, 1962; "Eros" Vol. 1, No. 4, 1962; and "The Housewife's Handbook on Selective Promiscuity" (referred to hereinafter as "Liaison", "Eros" and "The Handbook" respectively) was accomplish-

ed by large quantity distribution through a large mail order firm.

3. Defendants sought initially to obtain mailing from Blue Ball, Pennsylvania; secondly, from Intercourse, Pennsylvania; and finally succeeded in making arrangements for mailing from Middlesex, New Jersey, from which place all or substantially all of the mailings issued.

4. The particular places referred to in Finding No. 3 were chosen in order that the postmarks on mailed material would further defendants' general scheme and purpose.

5. The Handbook is a vivid, explicit and detailed account of a woman's sexual experiences from age three years to age thirty-six years which goes substantially beyond customary limits of candor exceeding contemporary community standards in description and representation of the matters described therein.

6. The Handbook appeals predominantly, taken as a whole, to prurient interest of the average adult reader in a shameful and morbid manner.

7. The Handbook is patently offensive on its face.

8. The Handbook treats sex in an unrealistic, exaggerated, bizarre, perverse, morbid and repetitious manner and creates a sense of shock, disgust and shame in the average adult reader.

9. The Handbook has not the slightest redeeming social, artistic or literary importance or value.

10. There is no credible evidence that The Handbook has the slightest valid scientific importance for treatment of individuals in clinical psychiatry, psychology, or any field of medicine.

11. Liaison consists primarily of matters relating to sex and in doing so it goes beyond customary limits of candor, exceeding contemporary standards in description and representation of the matters described therein.

12. Liaison primarily and as a whole is a shameful and morbid exploitation of sex published for the purpose of appealing to the prurient interest of the average individual.

13. Liaison has not the slightest redeeming social, artistic or literary importance or value.

14. Liaison is patently offensive on its face.

15. Liaison treats sex in an unrealistic, exaggerated, bizarre, perverse, morbid and repetitious manner and creates a sense of shock, disgust and shame in the average adult reader.

16. While portions of Eros are taken from other works and may have literary merit in context, Eros appeals predominantly, taken as a whole, to prurient interest of the average adult reader in a shameful and morbid manner.

17. The deliberate and studied arrangement of Eros is editorialized for the purpose of appealing predominantly to prurient interest and to insulate through the inclusion of non-offensive material.

18. Eros treats sex in an unrealistic, exaggerated, bizarre, perverse, morbid and repetitious manner and creates a sense of shock, disgust and shame in the average adult reader.

19. Eros has not the slightest redeeming social, artistic or literary importance or value taken as a whole.

## DISCUSSION

On March 15, 1963 the Grand Jury in the Eastern District of Pennsylvania returned a 28 count indictment charging defendants with mailing obscene publications and advertisements for those publications in violation of 18 U.S.C. § 1461. Defendants filed a motion to dismiss various counts of the indictment under Rule 12 of the Federal Rules of Criminal Procedure. Subsequent thereto, the Government filed a motion to strike the affidavit and exhibits appended to defendants' motion to dismiss the indictment. Oral argument was heard on both of these motions on May 17, 1963, and on that day the Court granted the Government's motion. On May 23, 1963 the Court denied defendants' motion to dismiss the indictment. From June 10 to June 14, 1963

the case was tried before the Court without a jury, and all defendants were found guilty on all counts. Defendants have filed a Motion in Arrest of Judgment, or, in the alternative for a New Trial, which motion is now before the Court.

A stipulation of counsel has been filed and approved by the Court. In this document the United States agrees that the advertising material (attached as exhibits to the stipulation) is not in and of itself obscene. In return, defendants admitted that said advertising material was mailed by defendants on the occasions alleged in the indictments with full knowledge of the nature of the contents thereof. In addition, counsel agreed that the alleged non-mailable materials, Liaison, Eros and The Handbook, were to be considered a part of the indictments as though fully set forth at length therein. Oral argument on the motions was waived by counsel. These motions are: a motion in arrest of judgment and, in the alternative, a motion for a new trial. In support of both motions defendants raise four issues.

## ALLEGED FAILURE OF THE COURT TO COMPLETELY READ THE INDICTMENT BEFORE RULING ON THE SUFFICIENCY THEREOF

During the presentation of the defendants' case the Court made a statement with respect to The Handbook which indicated that the Court had not read parts of The Handbook. Prior to this incident, the Court had denied the defendants' motions for dismissal of the indictment and for acquittal at the close of the Government's case. The issue presented by this situation is an issue only if one assumes that the stipulation requires that the Court consider the materials as part of the indictment. We assume this to be the case for purposes of disposing of defendants' contentions.

■ It is axiomatic that in ruling on motions involving the sufficiency of an indictment, the Court should read that indictment. We agree, therefore, that the indictment should be read by the Court. However, the Court did read the indictments involved herein before any decisions were made on any aspects of this case. It is true that not all, that is to say, not each and every word or sentence of each of the indicted materials was read in advance of all of the Court's rulings. Nevertheless, the original indictments were read. Moreover, the Court read enough of the indicted materials to be able to rule as a matter of law that the Government had made out a prima facie case. We do not deem it necessary to read each and every word or sentence of the indicted materials in an obscenity case in order to ascertain whether there is a prima facie case.

■ While it is true that in considering material in an obscenity case, the work as a whole must be examined; Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); it is not necessary to make a detailed and exhaustive examination on preliminary motions. Common sense dictates a realistic approach to this matter. The Handbook has 240 pages exclusive of introductory material. The material therein is extremely boring, disgusting, and shocking to this Court, as well as to an average reader. It was simply too offensive to stomach in the first instance. Even a fast reading, skipping the obviously repetitious phrases and descriptions, readily discloses the impact and essence of the book.

■ The rule is that when a defendant presents testimony and other evidence after a motion for acquittal has been overruled, the objections to the denial of his motion are waived United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954).

■ On the merits, since the Trial Court has since read all of The Handbook word by word, if there was error it is harmless. If in fact the material is obscene as a matter of fact and law, defendant was not prejudiced. This case was tried without a jury and the ultimate test after the case was submitted to the fact finder was much higher than it was when

the Court disposed of defendants' pretrial motions.

## FAILURE OF THE TRIAL COURT TO ENTER SPECIAL FINDINGS CONCURRENTLY WITH THE GENERAL FINDING

It may be that better practice in many criminal cases calls for the entry of special findings at the time the general finding is made when the Court sits without a jury. Benchwick v. United States, 297 F.2d 330 (9th Cir. 1961). This does not mean that it is required that both types of findings be made simultaneously. No case has been cited by counsel which so holds, and in like manner, exhaustive research discloses no such rule as contended for by defendants.

■ During the trial the Court made it clear to counsel on more than one occasion that the entry of special findings would be delayed beyond the entry of a general finding if a general finding of guilty was to be entered on any of the counts. There were no objections by defendants' counsel to this proposed procedure. Thus, any objection to the delayed entry of special findings was waived by silence on the record. Likewise after verdict was rendered by the Court, no objections were stated for the record at that time.

On the merits, this was not an ordinary criminal case where fundamental operative facts had to be determined. Most of the facts are not clear and precise but instead are mixed with questions of law. This is the nature of the case. It is necessary in such a case for the Court to carefully consider all the legal ramifications of the factual setting, which is really largely agreed upon. Such careful consideration requires detailed legal research and assistance of counsel. Consequently, the Trial Court requested proposed findings and such other assistance as counsel could offer. Defendants were not precluded from submitting findings but apparently chose not to do so. We find no merit in this issue raised by them, apparently as an afterthought.

## OBSCENITY

The remaining contentions of defendant attack the decision of the Court that as a matter of fact and of law the indicted materials are obscene under 18 U.S.C. § 1461.

■ In order that freedom of speech may remain protected and inviolate, the law requires definite standards for a finding of obscenity. These standards are set forth generally in the case of Roth v. United States (California), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). All ideas, no matter how obnoxious, unorthodox or controversial are protected. If material has any socially redeeming importance it is protected. Beyond this, material to be obscene must encroach upon significant interests of society, and thereby injure society without justification. Material embodied in permanent form and distributed generally does this when it is obscene. Roth v. United States (California), supra. Something is obscene according to the A.L.I., Model Penal Code, § 207.10(2):

> " * * * (I)f, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * * "

Roth v. California, supra, 354 U.S. at page 489, 77 S.Ct. 1311, 1 L.Ed.2d 1498, requires further that the material to be obscene must appeal in the above manner to the prurient interest of the average person, applying contemporary community standards. This has been held to mean that the standard is not to be applied from the point of view of particularly susceptible persons in the community. Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

In deciding whether the subject materials are obscene, each must of course be separately treated.

## "LIAISON" VOL. 1, NO. 1

*Liaison* is a newsletter or periodical folder type of publication consisting of commentary from various sources with a general editorial treatment. Specifically it deals with such subjects as "Slaying the Sex Dragon", Semen in the Diet" and "Sing a Song of Sex Life." The material covers the most perverse and offensive human behavior. While the treatment is largely superficial, it is presented entirely without restraint of any kind. According to defendants' own expert, it is entirely without literary merit. We agree. If there is any socially redeeming value in this material it must come from what is advocated or from its entertainment value. There are jokes and rhymes which clearly go beyond contemporary community standards of humor, even in applying liberal night club standards. The remainder of the material is of the same nature and exceeds the standard in the same manner.

One could take an entirely different view of some of the material in Liaison if it were artfully contrived or manipulated in a literary manner by incorporation into a work of merit to serve a legitimate purpose of an author in recording human experience or in seeking to accomplish a worthy objective. See, for example, Grove Press, Inc. v. Christenberry, 276 F.2d 433 (2d Cir. 1960) where it was held that the book Lady Chatterley's Lover was not obscene.

Unfortunately, however, Liaison is designed obviously and solely for the purpose of appealing to the prurient interest of an ordinary person. The only idea advocated is complete abandon of any restraint with regard to any form of sexual expression. This "idea" is nothing more than could be advocated by the most flagrant pornography, samples of which were submitted to the Court by defendants as examples of obscenity. Ideas must go beyond this point in order to be protected. The alternative is the absence of any restraint on written material from the point of view of obscenity.

## "EROS" VOL. 1, NO. 4, 1962

*Eros* is a carefully contrived magazine or periodical type of publication with a hard cover and glossy paper. It is replete with photographs and includes reproductions of recognized works of art. Nevertheless, as in the cases of Liaison and of The Handbook the dominant appeal is to pruriency. The works of art, such as biblical quotations and reproductions of the creations of recognized artists, are merely a facade to disguise and protect the basic purpose and effect of the entire work. This basic purpose and effect becomes evident as one progresses through the pages.

Although it is difficult to classify all of the articles in Eros into specific categories, there is a clearly defined arrangement to the material. To some, several articles might be considered innocuous, only slightly erotic and possibly not obscene in and of themselves. These are: "New Twists and 3 Great Trysts"; "The Jewel Box Revue", the series of photographs on marriage, circa 1903; The Short Story by Ray Bradbury; "Memoirs of a Male Chaperon"; "President Harding's Second Lady"; "Was Shakespeare a Homosexual"; "Sex and the Bible"; and perhaps Ivan Graznis' version of "Lysistrata". If the entire work consisted merely of these articles there might be no finding of obscenity in this case. This does not mean that the articles have no effect upon the finding of obscenity with regard to the periodical as a whole. Here is a pattern. Here is a craftily compiled overall effect and since the work must be considered as a whole, material which might be innocuous alone partakes of the obscenity elsewhere in Eros and becomes part and parcel of the overall plan and intent of the work. It is the opposite of the usual situation as in a novel where the dominant interest and theme is of social importance, and what would be patent obscenity standing alone is insulated and protected and saved from condemnation because of the work of art in which it is incorporated. Grove Press, Inc. v. Christenberry, supra.

Eros is the reverse situation from Lady Chatterley's Lover. There the author used material which, *taken out of context*, would have been clearly obscene. Nevertheless, the court found no obscenity because of the saving grace of the book as a whole. Eros has no saving grace. The items of possible merit and those items which might be considered innocuous are a mere disguise to avoid the law and in large measure enhance the pruriency of the entire work. The only overriding theme of Eros is the advocacy of complete sexual expression of whatever sort and manner. The most offensive pornography imaginable, examples of which were submitted by defendants as exhibits in this case, has the same dominant effect and purpose. Even so, of course, the dissemination of the idea of complete sexual freedom cannot constitutionally be punished. Therefore, it must be the *manner* of dissemination which is objectionable.

In considering the manner of expression of the idea then, we come to the work itself in its obscene portions. The articles called: "Frank Harris, His Life and Loves" including "My Life and Loves" by Frank Harris; "Bawdy Limericks" and the "Natural Superiority of Women as Erotocists" and "Black and White in Color" are such that standing alone, one has little difficulty in finding all of the requisite elements of obscenity. For example: "Bawdy Limericks" consists of the grossest terminology describing unnatural, offensive, disgusting and exaggerated sexual behavior. Also by way of example: the series of pictures, "Black and White in Color", constitutes a detailed portrayal of the act of sexual intercourse between a completely nude male and female, leaving nothing to the imagination. This material meets defendants' own experts' definition of obscenity as well as counsel's legal definition.

Pruriency is required and is defined as an itching, longing, morbid or shameful sexual desire. Roth v. California, supra. When material creates in the reader shame and guilt feelings simultaneously with sexual arousal, the result is usually obscenity. The material listed above clearly qualifies. There is no notable distinction between the aforesaid, taking each one as a whole, and the admittedly obscene material which was in evidence for comparison purposes.

The impact of these articles and items is sufficient to permeate the entire volume of Eros. By reading the article "A Letter from Allen Ginsburg" it becomes evident that the intent of the disseminator here was to cause this permeation, i. e., this "Letter" is a statement of the purpose of Eros. It is clear that there is no possible other way to view the matter. When material is composed of several portions, not related except insofar as each deals with sex in various forms, and at the same time this material includes obscene items, if these items are tested standing alone and if at the same time a single purpose of destruction of all barriers against sexual behavior of any kind is advocated along with the advocacy of removal of restraint by government over the dissemination of any written material whatsoever, there is but one conclusion. That conclusion is: there is specific intent to destroy any limitations whatsoever over any medium of human communication regardless of the extent of abuse of that medium through the use of obscenity. Therefore, defendants are in the unsavory position of advocating that obscenity should be disseminated, and at the same time they are deliberately purveying material through the mails which material is designed to break down those barriers imposed by the statute.

The inserting of innocuous material along with obscene material cannot shield the latter. If it could, the Bible itself could readily be rendered obscene, and yet could be disseminated without restraint, merely through the expediency of illustrating sexual references with the grossest pornographic photographs and by giving the participants biblical names. The answer is clear. It is one thing to create an integrated work of art containing what would be obscenity standing

alone, and another thing to create an integrated work of obscenity containing excerpts from recognized works of art.

It is interesting to note that in defining pornography, defendants' expert stated that it is common in such material that matters usually treated with respect, such as religion, are juxtaposed with and mocked by the writer. Inaccuracy and imaginary psychotic references to sexual activity is rampant in such works. Eros contains these elements. The front and back covers and the lead article deal with the Bible itself. "Bawdy Limericks" meets the test of bizarre and unrealistic treatment of sex. "The Sexual Side of Anti-Semitism" is headlined with a paragraph taken from the mouth of a psychotic person. These examples, and those elsewhere in this opinion, are offered as typical and are not by any means designed to constitute an exhaustive exposition of all of the material relevant to a finding of obscenity in detail. To do this would require a good-sized novel. Defendants press us for a quick disposition in order that their business not be ruined since they fear to continue publishing in the face of the finding of guilt. We, therefore, doubt that defendants are interested in a large volume of discourse in this opinion.

## "THE HOUSEWIFE'S HANDBOOK ON SELECTIVE PROMISCUITY" by REY ANTHONY

The Handbook requires little discussion. This book is a kind with the above-mentioned admittedly hardcore pornography. It is an explicit description of a woman's sexual experiences from early childhood and thereafter throughout most of her life. It purports to be, and the authoress so stated under oath, a factual and highly accurate reporting of actual occurrences. In fact Mrs. Lillian Maxine Serett, the authoress, stated: "I have lived every minute of it, or every page of it * * *" (N.T. page 121) We doubt the accuracy of this book. It also easily meets the previously mentioned tests of bizarre exaggeration, morbidness and offensiveness.

The Handbook's description of various sexual acts is astounding. As in the case of Liaison, no literary merit is ascribed to the book. Its sole claim to redeeming value is its alleged value as a clinical device to "ventilate" persons with sexual inhibitions and misconceptions. Any testimony to this effect is expressly disbelieved by this Court. One must regretfully note in passing that teen-age children were, and would be in the future, "ventilated" with this book by the witness who was alleged to be an expert clinical psychologist and also was an ordained minister. This same witness shocked the writer by saying that this book should be in every home and available for teen-agers for guidance in sex behavior, but in my opinion misbehavior.

The Handbook, standing bare of any socially redeeming value, is a patent offense to the most liberal morality. The descriptions leave nothing to the imagination, and in detail, in a clearly prurient manner offend, degrade and sicken anyone however healthy his mind was before exposure to this material. It is a gross shock to the mind and chore to read. Pruriency and disgust coalesce here creating a perfect example of hardcore pornography.

## CONCLUSION

 Defendants place great weight on the requirement of the definition of obscenity, as they see it, which protects works which do not exceed contemporary community standards of candor in expression. There is no question that all three of the indicted materials exceed this standard. Certain materials sold openly on local newsstands were submitted to show what the acceptable limits of candor are today. Without so deciding, it may well be that these materials exceed the contemporary standard themselves. At any rate, supplying this Court with such materials does not provide conclusive evidence of the standard set by the community as a whole. Doubtless but a sliver of the community reads such things and there is no doubt the community as a whole does not necessarily tol-

erate them. For all the Court knows, local action before this and in the future will result in the removal of this type of material from the newsstands. This Court has the power and the right as a fact finder and as one who is aware of all types of material sold, tolerated and not tolerated by the community as a whole, to find, as it has found, that the material in question exceeds the standard. It does so unequivocally.

We have been regaled with the theory that the susceptibility of no single segment of the community is to be the paramount consideration in deciding whether a work is obscene. Manual Enterprises v. Day, supra. This is the law and we do not argue with it. It is also the law that the community as a whole is the proper consideration. In this community, our society, we have children of all ages, psychotics, feeble-minded and other susceptible elements. Just as they cannot set the pace for the average adult reader's taste, they cannot be overlooked as part of the community. The community as a whole is not an ideal man who wouldn't seek and read obscenity in the first place. Otherwise no restraint at all would be required. Some is proper. Roth v. California, supra. Therefore, an ideal person without any failings or susceptibility is not the man to protect. Society as a whole, replete of course with various imperfections, must be protected.

There must come a time when the law must take a stand and determine what is legally obscene. It is all a matter of degree. Each publication is to be judged by itself, cover to cover, and as a whole. It is not merely a matter of four letter words, or the quantity of them. It is a matter of our concept of obscenity as defined and limited by the United States Supreme Court.

### ORDER

And now, this twenty-first day of November, 1963, in accordance with the foregoing opinion, it is ordered that the motions of defendants in Arrest of Judgment and, in the alternative, for a New Trial, be and the same are hereby denied.

It is further ordered that the defendants are called for sentence on November 27, 1963 at 10:00 A.M. in a courtroom of the United States District Court for the Eastern District of Pennsylvania.