GINZBURG ET AL. *v.* UNITED STATES.

No. 42. Argued December 7, 1965.—Decided March 21, 1966.

*Sidney Dickstein* argued the cause for petitioners. With him on the briefs was *George Kaufmann.*

*Paul Bender* argued the cause for the United States, *pro hac vice,* by special leave of Court. With him on the brief were *Solicitor General Marshall* and *Assistant Attorney General Vinson.*

Briefs of *amici curiae,* urging reversal, were filed by *Irwin Karp* for the Authors League of America, Inc.; by *Bernard A. Berkman* and *Melvin L. Wulf* for the American Civil Liberties Union et al.; and by *Horace S. Manges* and *Marshall C. Berger* for American Book Publishers Council, Inc.

Briefs of *amici curiae,* urging affirmance, were filed by *Charles H. Keating, Jr.,* and *James J. Clancy* for Citizens for Decent Literature, Inc., et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

A judge sitting without a jury in the District Court for the Eastern District of Pennsylvania [1] convicted petitioner Ginzburg and three corporations controlled by him upon all 28 counts of an indictment charging violation of the federal obscenity statute, 18 U. S. C. § 1461 (1964 ed.).[2] 224 F. Supp. 129. Each count alleged that a resident of the Eastern District received mailed matter, either one of three publications challenged as obscene, or advertising telling how and where the publications might

---

[1] No challenge was or is made to venue under 18 U. S. C. § 3237 (1964 ed.).

[2] The federal obscenity statute, 18 U. S. C. § 1461, provides in pertinent part:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, cr substance; and—

. . . . .

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or

be obtained. The Court of Appeals for the Third Circuit affirmed, 338 F. 2d 12. We granted certiorari, 380 U. S. 961. We affirm. Since petitioners do not argue that the trial judge misconceived or failed to apply the standards we first enunciated in *Roth* v. *United States*, 354 U. S. 476,[3] the only serious question is whether those standards were correctly applied.[4]

In the cases in which this Court has decided obscenity questions since *Roth*, it has regarded the materials as sufficient in themselves for the determination of the question. In the present case, however, the prosecution charged the offense in the context of the circumstances of production, sale, and publicity and assumed that, standing alone, the publications themselves might not be obscene. We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the ques-

---

indirectly, where, or how, or from whom, or by what means any of such mentioned matters . . . may be obtained . . . .

. . . . .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense . . . ."

[3] We are not, however, to be understood as approving all aspects of the trial judge's exegesis of *Roth*, for example his remarks that "the community as a whole is the proper consideration. In this community, our society, we have children of all ages, psychotics, feeble-minded and other susceptible elements. Just as they cannot set the pace for the average adult reader's taste, they cannot be overlooked as part of the community." 224 F. Supp., at 137. Compare *Butler* v. *Michigan*, 352 U. S. 380.

[4] The Government stipulated at trial that the circulars advertising the publications were not themselves obscene; therefore the convictions on the counts for mailing the advertising stand only if the mailing of the publications offended the statute.

tion of obscenity, and assume without deciding that the prosecution could not have succeeded otherwise. As in *Mishkin* v. *New York, post*, p. 502, and as did the courts below, 224 F. Supp., at 134, 338 F. 2d, at 14–15, we view the publications against a background of commercial exploitation of erotica solely for the sake of their prurient appeal.[5] The record in that regard amply supports the decision of the trial judge that the mailing of all three publications offended the statute.[6]

The three publications were EROS, a hard-cover magazine of expensive format; Liaison, a bi-weekly newsletter; and *The Housewife's Handbook on Selective Promiscuity* (hereinafter the *Handbook*), a short book. The issue of EROS specified in the indictment, Vol. 1, No. 4, contains 15 articles and photo-essays on the subject of love, sex, and sexual relations. The specified issue of Liaison, Vol. 1, No. 1, contains a prefatory "Letter from the Editors" announcing its dedication to "keeping sex an art and preventing it from becoming a science." The remainder of the issue consists of digests of two

---

[5] Our affirmance of the convictions for mailing EROS and Liaison is based upon their characteristics as a whole, including their editorial formats, and not upon particular articles contained, digested, or excerpted in them. Thus we do not decide whether particular articles, for example, in EROS, although identified by the trial judge as offensive, should be condemned as obscene whatever their setting. Similarly, we accept the Government's concession, note 13, *infra*, that the prosecution rested upon the manner in which the petitioners sold the *Handbook;* thus our affirmance implies no agreement with the trial judge's characterizations of the book outside that setting.

[6] It is suggested in dissent that petitioners were unaware that the record being established could be used in support of such an approach, and that petitioners should be afforded the opportunity of a new trial. However, the trial transcript clearly reveals that at several points the Government announced its theory that made the mode of distribution relevant to the determination of obscenity, and the trial court admitted evidence, otherwise irrelevant, toward that end.

articles concerning sex and sexual relations which had earlier appeared in professional journals and a report of an interview with a psychotherapist who favors the broadest license in sexual relationships. As the trial judge noted, "[w]hile the treatment is largely superficial, it is presented entirely without restraint of any kind. According to defendants' own expert, it is entirely without literary merit." 224 F. Supp., at 134. The *Handbook* purports to be a sexual autobiography detailing with complete candor the author's sexual experiences from age 3 to age 36. The text includes, and prefatory and concluding sections of the book elaborate, her views on such subjects as sex education of children, laws regulating private consensual adult sexual practices, and the equality of women in sexual relationships. It was claimed at trial that women would find the book valuable, for example as a marriage manual or as an aid to the sex education of their children.

Besides testimony as to the merit of the material, there was abundant evidence to show that each of the accused publications was originated or sold as stock in trade of the sordid business of pandering—"the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers." [7] EROS early sought mailing privileges from the postmasters of Intercourse and Blue Ball, Pennsylvania. The trial court found the obvious, that these hamlets were chosen only for the value their names would have in furthering petitioners' efforts to sell their publications on the basis of salacious appeal; [8] the facilities of the

---

[7] *Roth* v. *United States, supra,* 354 U. S., at 495–496 (WARREN, C. J., concurring).

[8] Evidence relating to petitioners' efforts to secure mailing privileges from these post offices was, contrary to the suggestion of MR. JUSTICE HARLAN in dissent, introduced for the purpose of supporting such a finding. Scienter had been stipulated prior to trial. The

post offices were inadequate to handle the anticipated volume of mail, and the privileges were denied. Mailing privileges were then obtained from the postmaster of Middlesex, New Jersey. EROS and Liaison thereafter mailed several million circulars soliciting subscriptions from that post office; over 5,500 copies of the *Handbook* were mailed.

The "leer of the sensualist" also permeates the advertising for the three publications. The circulars sent for EROS and Liaison stressed the sexual candor of the respective publications, and openly boasted that the publishers would take full advantage of what they regarded as an unrestricted license allowed by law in the expression of sex and sexual matters.[9] The advertising for the

---

Government's position was revealed in the following colloquy, which occurred when it sought to introduce a letter to the postmaster of Blue Ball, Pennsylvania:

"The COURT. Who signed the letter?

"Mr. CREAMER. It is signed by Frank R. Brady, Associate Publisher of Mr. Ginzburg. It is on Eros Magazine, Incorporated's stationery.

"The COURT. And your objection is——

"Mr. SHAPIRO. It is in no way relevant to the particular issue or publication upon which the defendant has been indicted and in my view, even if there was an identification with respect to a particular issue, it would be of doubtful relevance in that event.

"The COURT. Anything else to say?

"Mr. CREAMER. If Your Honor pleases, there is a statement in this letter indicating that it would be advantageous to this publication to have it disseminated through Blue Ball, Pennsylvania, post office. I think this clearly goes to intent, as to what the purpose of publishing these magazines was. At least, it clearly establishes one of the reasons why they were disseminating this material.

"The COURT. Admitted."

[9] Thus, one EROS advertisement claimed:

"Eros is a child of its times. . . . [It] is the result of recent court decisions that have realistically interpreted America's obscenity laws and that have given to this country a new breadth of freedom

*Handbook,* apparently mailed from New York, consisted almost entirely of a reproduction of the introduction of the book, written by one Dr. Albert Ellis. Although he alludes to the book's informational value and its putative therapeutic usefulness, his remarks are preoccupied with the book's sexual imagery. The solicitation was indiscriminate, not limited to those, such as physicians or psychiatrists, who might independently discern the book's

of expression. . . . EROS takes full advantage of this new freedom of expression. It is *the* magazine of sexual candor."

In another, more lavish spread:

"EROS is a new quarterly devoted to the subjects of Love and Sex. In the few short weeks since its birth, EROS has established itself as the rave of the American intellectual community—and the rage of prudes everywhere! And it's no wonder: EROS handles the subjects of Love and Sex with complete candor. The publication of this magazine—which is frankly and avowedly concerned with erotica—has been enabled by recent court decisions ruling that a literary piece or painting, though explicitly sexual in content, has a right to be published if it is a genuine work of art.

"EROS is a genuine work of art. . . ."

An undisclosed number of advertisements for Liaison were mailed. The outer envelopes of these ads ask, "Are you among the chosen few?" The first line of the advertisement eliminates the ambiguity: "Are you a member of the sexual elite?" It continues:

"That is, are you among the few happy and enlightened individuals who believe that a man and woman can make love without feeling pangs of conscience? Can you read about love and sex and discuss them without blushing and stammering?

"If so, you ought to know about an important new periodical called *Liaison.*

. . . . .

"In short, *Liaison* is Cupid's Chronicle. . . .

"Though *Liaison* handles the subjects of love and sex with complete candor, I wish to make it clear that it is not a scandal sheet and it is not written for the man in the street. *Liaison* is aimed at intelligent, educated adults who can accept love and sex as part of life.

". . . I'll venture to say that after you've read your first biweekly issue, *Liaison* will be your most eagerly awaited piece of mail."

therapeutic worth.[10] Inserted in each advertisement was a slip labeled "GUARANTEE" and reading, "Documentary Books, Inc. unconditionally guarantees full refund of the price of THE HOUSEWIFE'S HANDBOOK ON SELECTIVE PROMISCUITY if the book fails to reach you because of U. S. Post Office censorship interference." Similar slips appeared in the advertising for EROS and Liaison; they highlighted the gloss petitioners put on the publications, eliminating any doubt what the purchaser was being asked to buy.[11]

This evidence, in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality—whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly in a prosecution which, as here, does not necessarily imply sup-

---

[10] Note 13, *infra.*

[11] There is much additional evidence supporting the conclusion of petitioners' pandering. One of petitioners' former writers for Liaison, for example, testified about the editorial goals and practices of that publication.

pression of the materials involved, the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test.

A proposition argued as to EROS, for example, is that the trial judge improperly found the magazine to be obscene as a whole, since he concluded that only four of the 15 articles predominantly appealed to prurient interest and substantially exceeded community standards of candor, while the other articles were admittedly nonoffensive. But the trial judge found that "[t]he deliberate and studied arrangement of EROS is editorialized for the purpose of appealing predominantly to prurient interest and to insulate through the inclusion of nonoffensive material." 224 F. Supp., at 131. However erroneous such a conclusion might be if unsupported by the evidence of pandering, the record here supports it. EROS was created, represented and sold solely as a claimed instrument of the sexual stimulation it would bring. Like the other publications, its pervasive treatment of sex and sexual matters rendered it available to exploitation by those who would make a business of pandering to "the widespread weakness for titillation by pornography."[12] Petitioners' own expert agreed, correctly we think, that "[i]f the object [of a work] is material gain for the creator through an appeal to the sexual curiosity and appetite," the work is pornographic. In other words, by animating sensual detail to give the publication a salacious cast, petitioners reinforced what is conceded by the Government to be an otherwise debatable conclusion.

A similar analysis applies to the judgment regarding the *Handbook*. The bulk of the proofs directed to social importance concerned this publication. Before selling publication rights to petitioners, its author had

---

[12] Schwartz, Morals Offenses and the Model Penal Code, 63 Col. L. Rev. 669, 677 (1963).

printed it privately; she sent circulars to persons whose names appeared on membership lists of medical and psychiatric associations, asserting its value as an adjunct to therapy. Over 12,000 sales resulted from this solicitation, and a number of witnesses testified that they found the work useful in their professional practice. The Government does not seriously contest the claim that the book has worth in such a controlled, or even neutral, environment. Petitioners, however, did not sell the book to such a limited audience, or focus their claims for it on its supposed therapeutic or educational value; rather, they deliberately emphasized the sexually provocative aspects of the work, in order to catch the salaciously disposed. They proclaimed its obscenity; and we cannot conclude that the court below erred in taking their own evaluation at its face value and declaring the book as a whole obscene despite the other evidence.[13]

The decision in *United States* v. *Rebhuhn,* 109 F. 2d 512, is persuasive authority for our conclusion.[14] That

---

[13] The Government drew a distinction between the author's and petitioners' solicitation. At the sentencing proceeding the United States Attorney stated:

". . . [the author] was distributing . . . only to physicians; she never had widespread, indiscriminate distribution of the Handbook, and, consequently, the Post Office Department did not interfere . . . . If Mr. Ginzburg had distributed and sold and advertised these books solely to . . . physicians . . . we, of course, would not be here this morning with regard to The Housewife's Handbook . . . ."

[14] The Proposed Official Draft of the ALI Model Penal Code likewise recognizes the question of pandering as relevant to the obscenity issue, § 251.4 (4); Tentative Draft No. 6 (May 6, 1957), pp. 1–3, 13–17, 45–46, 53; Schwartz, *supra,* n. 12; see Craig, Suppressed Books, 195–206 (1963). Compare *Grove Press, Inc.* v. *Christenberry,* 175 F. Supp. 488, 496–497 (D. C. S. D. N. Y. 1959), aff'd 276 F. 2d 433 (C. A. 2d Cir. 1960); *United States* v. *One Book Entitled Ulysses,* 72 F. 2d 705, 707 (C. A. 2d Cir. 1934), affirming 5 F. Supp. 182 (D. C. S. D. N. Y. 1933). See also The Trial of Lady Chatterly—Regina v. Penguin Books, Ltd. (Rolph. ed. 1961).

was a prosecution under the predecessor to § 1461, brought in the context of pandering of publications assumed useful to scholars and members of learned professions. The books involved were written by authors proved in many instances to have been men of scientific standing, as anthropologists or psychiatrists. The Court of Appeals for the Second Circuit therefore assumed that many of the books were entitled to the protection of the First Amendment, and "could lawfully have passed through the mails, if directed to those who would be likely to use them for the purposes for which they were written . . . ." 109 F. 2d, at 514. But the evidence, as here, was that the defendants had not disseminated them for their "proper use, but . . . woefully misused them, and it was that misuse which constituted the gravamen of the crime." *Id.*, at 515. Speaking for the Court in affirming the conviction, Judge Learned Hand said:

"... [T]he works themselves had a place, though a limited one, in anthropology and in psychotherapy. They might also have been lawfully sold to laymen who wished seriously to study the sexual practices of savage or barbarous peoples, or sexual aberrations; in other words, most of them were not obscene per se. In several decisions we have held that the statute does not in all circumstances forbid the dissemination of such publications . . . . However, in the case at bar, the prosecution succeeded . . . when it showed that the defendants had indiscriminately flooded the mails with advertisements, plainly designed merely to catch the prurient, though under the guise of distributing works of scientific or literary merit. We do not mean that the distributor of such works is charged with a duty to insure that they shall reach only proper hands, nor need we say what care he must use, for these defendants exceeded any possible limit; the circulars were no more than ap-

peals to the salaciously disposed, and no [fact finder] could have failed to pierce the fragile screen, set up to cover that purpose." 109 F. 2d, at 514–515.

We perceive no threat to First Amendment guarantees in thus holding that in close cases evidence of pandering may be probative with respect to the nature of the material in question and thus satisfy the *Roth* test.[15] No weight is ascribed to the fact that petitioners have profited from the sale of publications which we have assumed but do not hold cannot themselves be adjudged obscene in the abstract; to sanction consideration of this fact might indeed induce self-censorship, and offend the frequently stated principle that commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment.[16] Rather, the fact that each of these publications was created or exploited entirely on the basis of its appeal to prurient interests [17] strengthens the conclusion that the transac-

---

[15] Our conclusion is consistent with the statutory scheme. Although § 1461, in referring to "obscene . . . matter" may appear to deal with the qualities of material in the abstract, it is settled that the mode of distribution may be a significant part in the determination of the obscenity of the material involved. *United States* v. *Rebhuhn, supra.* Because the statute creates a criminal remedy, cf. *Manual Enterprises* v. *Day,* 370 U. S. 478, 495 (opinion of BRENNAN, J.), it readily admits such an interpretation, compare *United States* v. *31 Photographs, etc.,* 156 F. Supp. 350 (D. C. S. D. N. Y. 1957).

[16] See *New York Times* v. *Sullivan,* 376 U. S. 254, 265–266; *Smith* v. *California,* 361 U. S. 147, 150.

[17] See *Valentine* v. *Chrestensen,* 316 U. S. 52, where the Court viewed handbills purporting to contain protected expression as merely commercial advertising. Compare that decision with *Jamison* v. *Texas,* 318 U. S. 413, and *Murdock* v. *Pennsylvania,* 319 U. S. 105, where speech having the characteristics of advertising was held to be an integral part of religious discussions and hence protected. Material sold solely to produce sexual arousal, like commercial advertising, does not escape regulation because it has been dressed up as speech, or in other contexts might be recognized as speech.

tions here were sales of illicit merchandise, not sales of constitutionally protected matter.[18] A conviction for mailing obscene publications, but explained in part by the presence of this element, does not necessarily suppress the materials in question, nor chill their proper distribution for a proper use. Nor should it inhibit the enterprise of others seeking through serious endeavor to advance human knowledge or understanding in science, literature, or art. All that will have been determined is that questionable publications are obscene in a context which brands them as obscene as that term is defined in *Roth*—a use inconsistent with any claim to the shelter of the First Amendment.[19] "The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting." *Roth* v. *United States,* 354 U. S., at 495 (WARREN, C. J., concurring).

It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged. Where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation

---

[18] Compare *Breard* v. *Alexandria,* 341 U. S. 622, with *Martin* v. *Struthers,* 319 U. S. 141. Cf. *Kovacs* v. *Cooper,* 336 U. S. 77; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490; *Cox* v. *Louisiana,* 379 U. S. 536, 559.

[19] One who advertises and sells a work on the basis of its prurient appeal is not threatened by the perhaps inherent residual vagueness of the *Roth* test, cf. *Dombrowski* v. *Pfister,* 380 U. S. 479, 486–487, 491–492; such behavior is central to the objectives of criminal obscenity laws. ALI Model Penal Code, Tentative Draft No. 6 (May 6, 1957), pp. 1–3, 13–17; Comments to the Proposed Official Draft § 251.4, *supra;* Schwartz, Morals Offenses and the Model Penal Code, 63 Col. L. Rev. 669, 677–681 (1963); Paul & Schwartz, Federal Censorship—Obscenity in the Mail, 212–219 (1961); see *Mishkin* v. *New York, post,* p. 502, at 507, n. 5.

through pervasive treatment or description of sexual matters, such evidence may support the determination that the material is obscene even though in other contexts the material would escape such condemnation.

Petitioners raise several procedural objections, principally directed to the findings which accompanied the trial court's memorandum opinion, Fed. Rules Crim. Proc. 23. Even on the assumption that petitioners' objections are well taken, we perceive no error affecting their substantial rights. *Affirmed.*

Mr. Justice Black, dissenting.

Only one stark fact emerges with clarity out of the confusing welter of opinions and thousands of words written in this and two other cases today.[1] That fact is that Ginzburg, petitioner here, is now finally and authoritatively condemned to serve five years in prison for distributing printed matter about sex which neither Ginzburg nor anyone else could possibly have known to be criminal. Since, as I have said many times, I believe the Federal Government is without any power whatever under the Constitution to put any type of burden on speech and expression of ideas of any kind (as distinguished from conduct), I agree with Part II of the dissent of my Brother Douglas in this case, and I would reverse Ginzburg's conviction on this ground alone. Even assuming, however, that the Court is correct in holding today that Congress does have power to clamp official censorship on some subjects selected by the Court, in some ways approved by it, I believe that the federal obscenity statute as enacted by Congress and as enforced by the Court against Ginzburg in this case should be held invalid on two other grounds.

---

[1] See No. 49, *Mishkin* v. *New York, post,* p. 502, and No. 368, *Memoirs* v. *Massachusetts, ante,* p. 413.

## I.

Criminal punishment by government, although universally recognized as a necessity in limited areas of conduct, is an exercise of one of government's most awesome and dangerous powers. Consequently, wise and good governments make all possible efforts to hedge this dangerous power by restricting it within easily identifiable boundaries. Experience, and wisdom flowing out of that experience, long ago led to the belief that agents of government should not be vested with power and discretion to define and punish as criminal past conduct which had not been clearly defined as a crime in advance. To this end, at least in part, written laws came into being, marking the boundaries of conduct for which public agents could thereafter impose punishment upon people. In contrast, bad governments either wrote no general rules of conduct at all, leaving that highly important task to the unbridled discretion of government agents at the moment of trial, or sometimes, history tells us, wrote their laws in an unknown tongue so that people could not understand them or else placed their written laws at such inaccessible spots that people could not read them. It seems to me that these harsh expedients used by bad governments to punish people for conduct not previously clearly marked as criminal are being used here to put Mr. Ginzburg in prison for five years.

I agree with my Brother HARLAN that the Court has in effect rewritten the federal obscenity statute and thereby imposed on Ginzburg standards and criteria that Congress never thought about; or if it did think about them, certainly it did not adopt them. Consequently, Ginzburg is, as I see it, having his conviction and sentence affirmed upon the basis of a statute amended by this Court for violation of which amended statute he was not charged in the courts below. Such an affirmance we

478

have said violates due process. *Cole* v. *Arkansas,* 333 U. S. 196. Compare *Shuttlesworth* v. *Birmingham,* 382 U. S. 87. Quite apart from this vice in the affirmance, however, I think that the criteria declared by a majority of the Court today as guidelines for a court or jury to determine whether Ginzburg or anyone else can be punished as a common criminal for publishing or circulating obscene material are so vague and meaningless that they practically leave the fate of a person charged with violating censorship statutes to the unbridled discretion, whim and caprice of the judge or jury which tries him. I shall separately discuss the three elements which a majority of the Court seems to consider material in proving obscenity.[2]

(a) The first element considered necessary for determining obscenity is that the dominant theme of the material taken as a whole must appeal to the prurient interest in sex. It seems quite apparent to me that human beings, serving either as judges or jurors, could

---

[2] As I understand all of the opinions in this case and the two related cases decided today, three things must be proven to establish material as obscene. In brief these are (1) the material must appeal to the prurient interest, (2) it must be patently offensive, and (3) it must have no redeeming social value. MR. JUSTICE BRENNAN in his opinion in *Memoirs* v. *Massachusetts, ante,* p. 413, which is joined by THE CHIEF JUSTICE and MR. JUSTICE FORTAS, is of the opinion that all three of these elements must coalesce before material can be labeled obscene. MR. JUSTICE CLARK in a dissenting opinion in *Memoirs* indicates, however, that proof of the first two elements alone is enough to show obscenity and that proof of the third—the material must be utterly without redeeming social value— is only an aid in proving the first two. In his dissenting opinion in *Memoirs* MR. JUSTICE WHITE states that material is obscene "if its predominant theme appeals to the prurient interest in a manner exceeding customary limits of candor." In the same opinion MR. JUSTICE WHITE states that the social importance test "is relevant only to determining the predominant prurient interest of the material."

not be expected to give any sort of decision on this element which would even remotely promise any kind of uniformity in the enforcement of this law. What conclusion an individual, be he judge or juror, would reach about whether the material appeals to "prurient interest in sex" would depend largely in the long run not upon testimony of witnesses such as can be given in ordinary criminal cases where conduct is under scrutiny, but would depend to a large extent upon the judge's or juror's personality, habits, inclinations, attitudes and other individual characteristics. In one community or in one courthouse a matter would be condemned as obscene under this so-called criterion but in another community, maybe only a few miles away, or in another courthouse in the same community, the material could be given a clean bill of health. In the final analysis the submission of such an issue as this to a judge or jury amounts to practically nothing more than a request for the judge or juror to assert his own personal beliefs about whether the matter should be allowed to be legally distributed. Upon this subjective determination the law becomes certain for the first and last time.

(b) The second element for determining obscenity as it is described by my Brother BRENNAN is that the material must be "patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters . . . ." Nothing that I see in any position adopted by a majority of the Court today and nothing that has been said in previous opinions for the Court leaves me with any kind of certainty as to whether the "community standards" [3] referred to are world-wide, nation-wide, section-wide, state-wide,

---

[3] See the opinion of MR. JUSTICE BRENNAN, concurred in by Mr. Justice Goldberg in *Jacobellis* v. *Ohio*, 378 U. S. 184, but compare the dissent in that case of THE CHIEF JUSTICE, joined by MR. JUSTICE CLARK, at 199.

country-wide, precinct-wide or township-wide. But even if some definite areas were mentioned, who is capable of assessing "community standards" on such a subject? Could one expect the same application of standards by jurors in Mississippi as in New York City, in Vermont as in California? So here again the guilt or innocence of a defendant charged with obscenity must depend in the final analysis upon the personal judgment and attitudes of particular individuals and the place where the trial is held. And one must remember that the Federal Government has the power to try a man for mailing obscene matter in a court 3,000 miles from his home.

(c) A third element which three of my Brethren think is required to establish obscenity is that the material must be "utterly without redeeming social value." This element seems to me to be as uncertain, if not even more uncertain, than is the unknown substance of the Milky Way. If we are to have a free society as contemplated by the Bill of Rights, then I can find little defense for leaving the liberty of American individuals subject to the judgment of a judge or jury as to whether material that provokes thought or stimulates desire is "utterly without redeeming social value . . . ." Whether a particular treatment of a particular subject is with or without social value in this evolving, dynamic society of ours is a question upon which no uniform agreement could possibly be reached among politicians, statesmen, professors, philosophers, scientists, religious groups or any other type of group. A case-by-case assessment of social values by individual judges and jurors is, I think, a dangerous technique for government to utilize in determining whether a man stays in or out of the penitentiary.

My conclusion is that certainly after the fourteen separate opinions handed down in these three cases today no person, not even the most learned judge much less a layman, is capable of knowing in advance of an ultimate

decision in his particular case by this Court whether certain material comes within the area of "obscenity" as that term is confused by the Court today. For this reason even if, as appears from the result of the three cases today, this country is far along the way to a censorship of the subjects about which the people can talk or write, we need not commit further constitutional transgressions by leaving people in the dark as to what literature or what words or what symbols if distributed through the mails make a man a criminal. As bad and obnoxious as I believe governmental censorship is in a Nation that has accepted the First Amendment as its basic ideal for freedom, I am compelled to say that censorship that would stamp certain books and literature as illegal in advance of publication or conviction would in some ways be preferable to the unpredictable book-by-book censorship into which we have now drifted.

I close this part of my dissent by saying once again that I think the First Amendment forbids any kind or type or nature of governmental censorship over views as distinguished from conduct.

## II.

It is obvious that the effect of the Court's decisions in the three obscenity cases handed down today is to make it exceedingly dangerous for people to discuss either orally or in writing anything about sex. Sex is a fact of life. Its pervasive influence is felt throughout the world and it cannot be ignored. Like all other facts of life it can lead to difficulty and trouble and sorrow and pain. But while it may lead to abuses, and has in many instances, no words need be spoken in order for people to know that the subject is one pleasantly interwoven in all human activities and involves the very substance of the creation of life itself. It is a subject which people are bound to consider and discuss whatever laws are passed

by any government to try to suppress it. Though I do not suggest any way to solve the problems that may arise from sex or discussions about sex, of one thing I am confident, and that is that federal censorship is not the answer to these problems. I find it difficult to see how talk about sex can be placed under the kind of censorship the Court here approves without subjecting our society to more dangers than we can anticipate at the moment. It was to avoid exactly such dangers that the First Amendment was written and adopted. For myself I would follow the course which I believe is required by the First Amendment, that is, recognize that sex at least as much as any other aspect of life is so much a part of our society that its discussion should not be made a crime.

I would reverse this case.

MR. JUSTICE DOUGLAS, dissenting.

Today's condemnation of the use of sex symbols to sell literature engrafts another exception on First Amendment rights that is as unwarranted as the judge-made exception concerning obscenity. This new exception condemns an advertising technique as old as history. The advertisements of our best magazines are chock-full of thighs, ankles, calves, bosoms, eyes, and hair, to draw the potential buyer's attention to lotions, tires, food, liquor, clothing, autos, and even insurance policies. The sexy advertisement neither adds to nor detracts from the quality of the merchandise being offered for sale. And I do not see how it adds to or detracts one whit from the legality of the book being distributed. A book should stand on its own, irrespective of the reasons why it was written or the wiles used in selling it. I cannot imagine any promotional effort that would make chapters 7 and 8 of the Song of Solomon any the less

or any more worthy of First Amendment protection than does their unostentatious inclusion in the average edition of the Bible.

## I.

The Court has, in a variety of contexts, insisted that preservation of rights safeguarded by the First Amendment requires vigilance. We have recognized that a "criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms." *Dombrowski* v. *Pfister,* 380 U. S. 479, 486. Where uncertainty is the distinguishing characteristic of a legal principle—in this case the Court's "pandering" theory—"the free dissemination of ideas may be the loser." *Smith* v. *California,* 361 U. S. 147, 151. The Court today, however, takes the other course, despite the admonition in *Speiser* v. *Randall,* 357 U. S. 513, 525, that "[t]he separation of legitimate from illegitimate speech calls for . . . sensitive tools." Before today, due regard for the frailties of free expression led us to reject insensitive procedures [1] and clumsy, vague, or overbroad substantive rules even in the realm of obscenity.[2] For as the Court emphasized in *Roth* v. *United States,* 354 U. S. 476, 488, "[t]he door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests."

Certainly without the aura of sex in the promotion of these publications their contents cannot be said to be

---

[1] *Marcus* v. *Search Warrant,* 367 U. S. 717; *A Quantity of Books* v. *Kansas,* 378 U. S. 205; *Freedman* v. *Maryland,* 380 U. S. 51.

[2] *Butler* v. *Michigan,* 352 U. S. 380; *Smith* v. *California,* 361 U. S. 147; *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478 (opinion of HARLAN, J.).

"utterly without redeeming social importance." *Roth* v. *United States, supra,* at 484.[3] One of the publications condemned today is the Housewife's Handbook on Selective Promiscuity, which a number of doctors and psychiatrists thought had clinical value. One clinical psychologist said: "I should like to recommend it, for example, to the people in my church to read, especially those who are having marital difficulties, in order to increase their tolerance and understanding for one another. Much of the book, I should think, would be very suitable reading for teen age people, especially teen age young women who could empathize strongly with the growing up period that Mrs. Rey [Anthony] relates, and could read on and be disabused of some of the unrealistic notions about marriage and sexual experiences. I should think this would make very good reading for the average man to help him gain a better appreciation of female sexuality."

The Rev. George Von Hilsheimer III, a Baptist minister,[4] testified that he has used the book "insistently in

---

[3] The Court's premise is that Ginzburg represented that his publications would be sexually arousing. The Court, however, recognized in *Roth:* "[S]ex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to *prurient* interest . . . i. e., a shameful or morbid interest in nudity, sex, or excretion . . . ." *Id.,* 487 and n. 20 (emphasis added). The advertisements for these publications, which the majority quotes (*ante,* at 468–469, n. 9), promised candor in the treatment of matters pertaining to sex, and at the same time proclaimed that they were artistic or otherwise socially valuable. In effect, then, these advertisements represented that the publications are *not* obscene.

[4] Rev. Von Hilsheimer obtained an A. B. at the University of Miami in 1951. He did graduate work in psychology and studied analysis and training therapy. Thereafter, he did graduate work as a theological student, and received a degree as a Doctor of Divinity from the University of Chicago in 1957. He had exten-

my pastoral counseling and in my formal psychological counseling":

> "The book is a history, a very unhappy history, of a series of sexual and psychological misadventures and the encounter of a quite typical and average American woman with quite typical and average American men. The fact that the book itself is the history of a woman who has had sexual adventures outside the normally accepted bounds of marriage which, of course for most Americans today, is a sort of serial polygamy, it does not teach or advocate this, but gives the women to whom I give the book at least a sense that their own experiences are not unusual, that their sexual failures are not unusual, and that they themselves should not be guilty because they are, what they say, sexual failures."

I would think the Baptist minister's evaluation would be enough to satisfy the Court's test, unless the censor's word is to be final or unless the experts are to be weighed in the censor's scales, in which event one Anthony Comstock would too often prove more weighty than a dozen more detached scholars, or unless we, the ultimate Board of Censors, are to lay down standards for review that give the censor the benefit of the "any evidence" rule or the "substantial evidence" rule as in the administrative law field. Cf. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474. Or perhaps we mean to let the courts sift and choose among conflicting versions of the "redeeming social importance" of a particular book, making sure that they keep their findings clear of doubt lest we reverse, as

---

sive experience as a group counselor, lecturer, and family counselor. He was a consultant to President Kennedy's Study Group on National Voluntary Services, and a member of the board of directors of Mobilization for Youth.

we do today in *Memoirs* v. *Massachusetts, ante,* p. 413, because the lower court in an effort to be fair showed how two-sided the argument was. Since the test is whether the publication is "utterly without redeeming social importance," then I think we should honor the opinion of the Baptist minister who testified as an expert in the field of counseling.

Then there is the newsletter *Liaison*. One of the defendants' own witnesses, critic Dwight Macdonald, testified that while, in his opinion, it did not go beyond the customary limits of candor tolerated by the community, it was "an extremely tasteless, vulgar and repulsive issue." This may, perhaps, overstate the case, but *Liaison* is admittedly little more than a collection of "dirty" jokes and poems, with the possible exception of an interview with Dr. Albert Ellis. As to this material, I find wisdom in the words of the late Judge Jerome Frank:

> "Those whose views most judges know best are other lawyers. Judges can and should take judicial notice that, at many gatherings of lawyers at Bar Association or of alumni of our leading law schools, tales are told fully as 'obscene' as many of those distributed by men . . . convicted for violation of the obscenity statute. . . . 'One thinks of the lyrics sung . . . by a certain respected and conservative member of the faculty of a great law-school which considers itself the most distinguished and which is the Alma Mater of many judges sitting on upper courts.' " [5]

*Liaison's* appeal is neither literary nor spiritual. But neither is its appeal to a "shameful or morbid interest in nudity, sex, or excretion." The appeal is to the ribald

---

[5] *United States* v. *Roth,* 237 F. 2d 796, 822 and n. 58 (concurring opinion).

sense of humor which is—for better or worse—a part of our culture. A mature society would not suppress this newsletter as obscene but would simply ignore it.

Then there is EROS. The Court affirms the judgment of the lower court, which found only four of the many articles and essays to be obscene. One of the four articles consisted of numerous ribald limericks, to which the views expressed as to *Liaison* would apply with equal force. Another was a photo essay entitled "Black and White in Color" which dealt with interracial love: a subject undoubtedly offensive to some members of our society. Critic Dwight Macdonald testified:

> "I suppose if you object to the idea of a Negro and a white person having sex together, then, of course, you would be horrified by it. I don't. From the artistic point of view I thought it was very good. In fact, I thought it was done with great taste, and I don't know how to say it—I never heard of him before, but he is obviously an extremely competent and accomplished photographer."

Another defense witness, Professor Horst W. Janson, presently the Chairman of the Fine Arts Department at New York University, testified:

> "I think they are outstandingly beautiful and artistic photographs. I can not imagine the theme being treated in a more lyrical and delicate manner than it has been done here.
>
> . . . . .
>
> "I might add here that of course photography in appropriate hands is an artistic instrument and this particular photographer has shown a very great awareness of compositional devices and patterns that have a long and well-established history in western art.
>
> . . . . .

488

"The very contrast in the color of the two bodies of course has presented him with certain opportunities that he would not have had with two models of the same color, and he has taken rather extraordinary and very delicate advantage of these contrasts."

The third article found specifically by the trial judge to be obscene was a discussion by Drs. Eberhard W. and Phyllis C. Kronhausen of erotic writing by women, with illustrative quotations.[6] The worth of the article was discussed by Dwight Macdonald, who stated:

"I thought [this was] an extremely interesting and important study with some remarkable quotations from the woman who had put down her sense of love-making, of sexual intercourse . . . in an extremely eloquent way. I have never seen this from the woman's point of view. I thought the point they made, the difference between the man's and the woman's approach to sexual intercourse was very well made and very important."

Still another article found obscene was a short introduction to and a lengthy excerpt from My Life and Loves by Frank Harris, about which there is little in the record. Suffice it to say that this seems to be a book of some literary stature. At least I find it difficult on this record to say that it is "utterly without redeeming social importance."[7]

[6] The Kronhausens wrote Pornography and the Law (1959).

[7] The extensive literary comment which the book's publication generated demonstrates that it is not "utterly without redeeming social importance." See, e. g., New York Review of Books, p. 6 (Jan. 9, 1964); New Yorker, pp. 79–80 (Jan. 4, 1964); Library Journal, pp. 4743–4744 (Dec. 15, 1963); New York Times Book Review, p. 10 (Nov. 10, 1963); Time, pp. 102–104 (Nov. 8, 1963); Newsweek, pp. 98–100 (Oct. 28, 1963); New Republic, pp. 23–27 (Dec. 28, 1963).

Some of the tracts for which these publishers go to prison concern normal sex, some homosexuality, some the masochistic yearning that is probably present in everyone and dominant in some. Masochism is a desire to be punished or subdued. In the broad frame of reference the desire may be expressed in the longing to be whipped and lashed, bound and gagged, and cruelly treated.[8] Why is it unlawful to cater to the needs of this group? They are, to be sure, somewhat offbeat, nonconformist, and odd. But we are not in the realm of criminal conduct, only ideas and tastes. Some like Chopin, others like "rock and roll." Some are "normal," some are masochistic, some deviant in other respects, such as the homosexual. Another group also represented here translates mundane articles into sexual symbols. This group, like those embracing masochism, are anathema to the so-called stable majority. But why is freedom of the press and expression denied them? Are they to be barred from communicating in symbolisms important to them? When the Court today speaks of "social value," does it mean a "value" to the majority? Why is not a minority "value" cognizable? The masochistic group is one; the deviant group is another. Is it not important that members of those groups communicate with each other? Why is communication by the "written word" forbidden? If we were wise enough, we might know that communication may have greater therapeutical value than any sermon that those of the "normal" community can ever offer. But if the communication is of value to the masochistic community or to others of the deviant community, how can it be said to be "utterly

---

[8] See Krafft-Ebing, Psychopathia Sexualis, p. 89 *et seq.* (1893); Eisler, Man Into Wolf, p. 23 *et seq.* (1951); Stekel, Sadism and Masochism (1929) *passim;* Bergler, Principles of Self-Damage (1959) *passim;* Reik, Masochism in Modern Man (1941) *passim.*

without redeeming social importance"? "Redeeming" to whom? "Importance" to whom?

We took quite a different stance in *One, Inc.* v. *Olesen,* 355 U. S. 371, where we unanimously reversed the decision of the Court of Appeals in 241 F. 2d 772 without opinion. Our holding was accurately described by Lockhart and McClure, Obscenity Censorship: The Core Constitutional Issue—What Is Obscene? 7 Utah L. Rev. 289, 293 (1961):

> "[This] was a magazine for homosexuals entitled *One—The Homosexual Magazine,* which was definitely not a scientific or critical magazine, but appears to have been written to appeal to the tastes and interests of homosexuals." [9]

---

[9] The Court of Appeals summarized the contents as follows:

"The article 'Sappho Remembered' is the story of a lesbian's influence on a young girl only twenty years of age but 'actually nearer sixteen in many essential ways of maturity,' in her struggle to choose between a life with the lesbian, or a normal married life with her childhood sweetheart. The lesbian's affair with her roommate while in college, resulting in the lesbian's expulsion from college, is recounted to bring in the jealousy angle. The climax is reached when the young girl gives up her chance for a normal married life to live with the lesbian. This article is nothing more than cheap pornography calculated to promote lesbianism. It falls far short of dealing with homosexuality from the scientific, historical and critical point of view.

"The poem 'Lord Samuel and Lord Montagu' is about the alleged homosexual activities of Lord Montagu and other British Peers and contains a warning to all males to avoid the public toilets while Lord Samuel is 'sniffing round the drains' of Piccadilly (London)....

. . . . .

"The stories 'All This and Heaven Too,' and 'Not Til the End,' pages 32–36, are similar to the story 'Sappho Remembered,' except that they relate to the activities of the homosexuals rather than lesbians." 241 F. 2d 772, 777, 778.

There are other decisions of ours which also reversed judgments condemning publications catering to a wider range of literary tastes

Man was not made in a fixed mould. If a publication caters to the idiosyncrasies of a minority, why does it not have some "social importance"? Each of us is a very temporary transient with likes and dislikes that cover the spectrum. However plebian my tastes may be, who am I to say that others' tastes must be so limited and that other tastes have no "social importance"? How can we know enough to probe the mysteries of the subconscious of our people and say that this is good for them and that is not? Catering to the most eccentric taste may have "social importance" in giving that minority an opportunity to express itself rather than to repress its inner desires, as I suggest in my separate opinion in *Memoirs* v. *Massachusetts, ante,* at 431–432. How can we know that this expression may not *prevent* antisocial conduct?

I find it difficult to say that a publication has no "social importance" because it caters to the taste of the most unorthodox amongst us. We members of this Court should be among the last to say what should be orthodox in literature. An omniscience would be required which few.in our whole society possess.

## II.

This leads me to the conclusion, previously noted, that the First Amendment allows all ideas to be expressed—whether orthodox, popular, offbeat, or repulsive. I do not think it permissible to draw lines between

than we seem to tolerate today. See, *e. g., Mounce* v. *United States,* 355 U. S. 180, vacating and remanding 247 F. 2d 148 (nudist magazines); *Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372, reversing 101 U. S. App. D. C. 358, 249 F. 2d 114 (nudist magazine); *Tralins* v. *Gerstein,* 378 U. S. 576, reversing 151 So. 2d 19 (book titled "Pleasure Was My Business" depicting the happenings in a house of prostitution); *Grove Press* v. *Gerstein,* 378 U. S. 577, reversing 156 So. 2d 537 (book titled "Tropic of Cancer" by Henry Miller).

the "good" and the "bad" and be true to the constitutional mandate to let all ideas alone. If our Constitution permitted "reasonable" regulation of freedom of expression, as do the constitutions of some nations,[10] we would be in a field where the legislative and the judiciary would have much leeway. But under our charter all regulation or control of expression is barred. Government does not sit to reveal where the "truth" is. People are left to pick and choose between competing offerings. There is no compulsion to take and read what is repulsive any more than there is to spend one's time poring over government bulletins, political tracts, or theological treatises. The theory is that people are mature enough to pick and choose, to recognize trash when they see it, to be attracted to the literature that satisfies their deepest need, and, hopefully, to move from plateau to plateau and finally reach the world of enduring ideas.

I think this is the ideal of the Free Society written into our Constitution. We have no business acting as censors or endowing any group with censorship powers. It is shocking to me for us to send to prison anyone for publishing anything, especially tracts so distant from any incitement to action as the ones before us.

[This opinion applies also to *Mishkin* v. *New York, post*, p. 502.]

---

[10] See, *e. g.,* Constitution of the Union of Burma, Art. 17 (i), reprinted in I Peaslee, Constitutions of Nations, p. 281 (2d ed. 1956); Constitution of India, Art. 19 (2), II Peaslee, *op. cit. supra,* p. 227; Constitution of Ireland, Art. 40 (6)(1)(i), II Peaslee, *op. cit. supra,* p. 458; Federal Constitution of the Swiss Confederation, Art. 55, III Peaslee, *op. cit. supra,* p. 344; Constitution of Libya, Art. 22, I Peaslee, Constitutions of Nations, p. 438 (3d ed. 1965); Constitution of Nigeria, Art. 25 (2), *id.,* p. 605; Constitution of Zambia, Art. 22 (2), *id.,* pp. 1040–1041.

Mr. Justice Harlan, dissenting.

I would reverse the convictions of Ginzburg and his three corporate co-defendants. The federal obscenity statute under which they were convicted, 18 U. S. C. § 1461 (1964 ed.), is concerned with unlawful shipment of "nonmailable" matter. In my opinion announcing the judgment of the Court in *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, the background of the statute was assessed, and its focus was seen to be solely on the character of the material in question. That too has been the premise on which past cases in this Court arising under this statute, or its predecessors, have been decided. See, *e. g., Roth* v. *United States,* 354 U. S. 476. I believe that under this statute the Federal Government is constitutionally restricted to banning from the mails only "hardcore pornography," see my separate opinion in *Roth, supra,* at 507, and my dissenting opinion in *A Book Named "John Cleland's Memoirs"* v. *Attorney General of Massachusetts, ante,* p. 455. Because I do not think it can be maintained that the material in question here falls within that narrow class, I do not believe it can be excluded from the mails.

The Court recognizes the difficulty of justifying these convictions; the majority refuses to approve the trial judge's "exegesis of *Roth*" (note 3, *ante,* p. 465); it declines to approve the trial court's "characterizations" of the Handbook "outside" the "setting" which the majority for the first time announces to be crucial to this conviction (note 5, *ante,* p. 466). Moreover, the Court accepts the Government's concession that the Handbook has a certain "worth" when seen in something labeled a "controlled, or even neutral, environment" *(ante,* p. 472); the majority notes that these are "publications which we have assumed . . . cannot themselves be adjudged obscene in the abstract" *(ante,* p. 474). In fact, the Court in the last analysis sustains the convictions on the

express assumption that the items held to be obscene are not, viewing them strictly, obscene at all (*ante,* p. 466).

This curious result is reached through the elaboration of a theory of obscenity entirely unrelated to the language, purposes, or history of the federal statute now being applied, and certainly different from the test used by the trial court to convict the defendants. While the precise holding of the Court is obscure, I take it that the objective test of *Roth,* which ultimately focuses on the material in question, is to be supplemented by another test that goes to the question whether the mailer's aim is to "pander" to or "titillate" those to whom he mails questionable matter.

Although it is not clear whether the majority views the panderer test as a statutory gloss or as constitutional doctrine, I read the opinion to be in the latter category.[1] The First Amendment, in the obscenity area, no longer fully protects material on its face nonobscene, for such material must now also be examined in the light of the defendant's conduct, attitude, motives. This seems to me a mere euphemism for allowing punishment of a person who mails otherwise constitutionally protected material just because a jury or a judge may not find him or his business agreeable. Were a State to enact a "panderer" statute under its police power, I have little doubt that—subject to clear drafting to avoid attacks on vagueness and equal protection grounds—such a statute would be constitutional. Possibly the same might be true of the Federal Government acting under its postal or commerce powers. What I fear the Court has done today is in effect to write a new statute, but without the sharply focused definitions and standards necessary in such a sensitive area. Casting such a dubious gloss over a

---

[1] The prevailing opinion in *Memoirs* v. *Massachusetts, antc,* p. 413, makes clearer the constitutional ramifications of this new doctrine.

straightforward 101-year-old statute (see 13 Stat. 507) is for me an astonishing piece of judicial improvisation.

It seems perfectly clear that the theory on which these convictions are now sustained is quite different from the basis on which the case was tried and decided by the District Court and affirmed by the Court of Appeals.[2] The District Court found the Handbook "patently offensive on its face" and without "the slightest redeeming social, artistic or literary importance or value"; it held that there was "no credible evidence that The Handbook has the slightest valid scientific importance for treatment of individuals in clinical psychiatry, psychology, or any field of medicine." 224 F. Supp. 129, 131. The trial court made similar findings as to Eros and Liaison. The majority's opinion, as I read it, casts doubts upon these explicit findings. As to the Handbook, the Court interprets an offhand remark by the government prosecutor at the sentencing hearing as a "concession," which the majority accepts, that the prosecution rested upon the conduct of the petitioner, and the Court explicitly refuses to accept the trial judge's "characterizations" of the book, which I take to be an implied rejection of the findings of fact upon which the conviction was in fact based (note 5, *ante,* p. 466). Similarly as to Eros, the Court implies that the finding of obscenity might be "erroneous" were it not supported "by the evidence of pandering" (*ante,* p. 471). The Court further characterizes the Eros decision, aside from pandering, as "an otherwise debatable conclusion" (*ante,* p. 471).

If there is anything to this new pandering dimension to the mailing statute, the Court should return the case

---

[2] Although at one point in its opinion the Court of Appeals referred to "the shoddy business of pandering," 338 F. 2d 12, 15, a reading of the opinion as a whole plainly indicates that the Court of Appeals did not affirm these convictions on the basis on which this Court now sustains them.

for a new trial, for petitioners are at least entitled to a day in court on the question on which their guilt has ultimately come to depend. Compare the action of the Court in *Memoirs* v. *Massachusetts, ante,* p. 413, also decided today, where the Court affords the State an opportunity to prove in a subsequent prosecution that an accused purveyor of *Fanny Hill* in fact used pandering methods to secure distribution of the book.

If a new trial were given in the present case, as I read the Court's opinion, the burden would be on the Government to show that the motives of the defendants were to pander to "the widespread weakness for titillation by pornography" (*ante,* p. 471). I suppose that an analysis of the type of individuals receiving Eros and the Handbook would be relevant. If they were ordinary people, interested in purchasing Eros or the Handbook for one of a dozen personal reasons, this might be some evidence of pandering to the general public. On the other hand, as the Court suggests, the defendants could exonerate themselves by showing that they sent these works only or perhaps primarily (no standards are set) to psychiatrists and other serious-minded professional people. Also relevant would apparently be the nature of the mailer's advertisements or representations. Conceivably someone mailing to the public selective portions of a recognized classic with the avowed purpose of titillation would run the risk of conviction for mailing nonmailable matter. Presumably the Post Office under this theory might once again attempt to ban Lady Chatterley's Lover, which a lower court found not bannable in 1960 by an abstract application of *Roth.* *Grove Press, Inc.* v. *Christenberry,* 276 F. 2d 433. I would suppose that if the Government could show that Grove Press is pandering to people who are interested in the book's sexual passages and not in D. H. Lawrence's social theories or literary technique § 1461 could properly be

invoked. Even the well-known opinions of Judge A. N. Hand in *United States* v. *One Book Entitled Ulysses,* 72 F. 2d 705, and of Judge Woolsey in the District Court, 5 F. Supp. 182, might be rendered nugatory if a mailer of Ulysses is found to be titillating readers with its "coarse, blasphemous, and obscene" portions, 72 F. 2d, at 707, rather than piloting them through the intricacies of Joyce's stream of consciousness.

In the past, as in the trial of these petitioners, evidence as to a defendant's conduct was admissible only to show relevant intent.[3] Now evidence not only as to conduct, but also as to attitude and motive, is admissible on the primary question of whether the material mailed is obscene. I have difficulty seeing how these inquiries are logically related to the question whether a particular work is obscene. In addition, I think such a test for obscenity is impermissibly vague, and unwarranted by anything in the First Amendment or in 18 U. S. C. § 1461.

I would reverse the judgments below.

Mr. Justice Stewart, dissenting.

Ralph Ginzburg has been sentenced to five years in prison for sending through the mail copies of a magazine,

---

[3] To show pandering, the Court relies heavily on the fact that the defendants sought mailing privileges from the postmasters of Intercourse and Blue Ball, Pennsylvania, before settling upon Middlesex, New Jersey, as a mailing point (*ante,* pp. 467–468). This evidence was admitted, however, only to show required scienter, see 338 F. 2d 12, 16. On appeal to the Court of Appeals and to this Court, petitioner Ginzburg asserted that at most the evidence shows the intent of petitioner Eros Magazine, Inc., and was erroneously used against him. The Court of Appeals held the point *de minimis,* 338 F. 2d, at 16–17, on the ground that the parties had stipulated the necessary intent. The United States, in its brief in this Court, likewise viewed this evidence as relating solely to *scienter;* nowhere did the United States attempt to sustain these convictions on anything like a pandering theory.

a pamphlet, and a book. There was testimony at his trial that these publications possess artistic and social merit. Personally, I have a hard time discerning any. Most of the material strikes me as both vulgar and unedifying. But if the First Amendment means anything, it means that a man cannot be sent to prison merely for distributing publications which offend a judge's esthetic sensibilities, mine or any other's.

Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime. Long ago those who wrote our First Amendment charted a different course. They believed a society can be truly strong only when it is truly free. In the realm of expression they put their faith, for better or for worse, in the enlightened choice of the people, free from the interference of a policeman's intrusive thumb or a judge's heavy hand. So it is that the Constitution protects coarse expression as well as refined, and vulgarity no less than elegance. A book worthless to me may convey something of value to my neighbor. In the free society to which our Constitution has committed us, it is for each to choose for himself.[1]

Because such is the mandate of our Constitution, there is room for only the most restricted view of this Court's decision in *Roth* v. *United States,* 354 U. S. 476. In that case the Court held that "obscenity is not within the area of constitutionally protected speech or press."

---

[1] Different constitutional questions would arise in a case involving an assault upon individual privacy by publication in a manner so blatant or obtrusive as to make it difficult or impossible for an unwilling individual to avoid exposure to it. Cf. *e. g., Breard* v. *Alexandria,* 341 U. S. 622; *Public Utilities Commission of the District of Columbia* v. *Pollak,* 343 U. S. 451; *Griswold* v. *Connecticut,* 381 U. S. 479. Still other considerations might come into play with respect to laws limited in their effect to those deemed insufficiently adult to make an informed choice. No such issues were tendered in this case.

*Id.*, at 485. The Court there characterized obscenity as that which is "utterly without redeeming social importance," *id.*, at 484, "deals with sex in a manner appealing to prurient interest," *id.*, at 487, and "goes substantially beyond customary limits of candor in description or representation of such matters." *Id.*, at 487, n. 20.[2] In *Manual Enterprises* v. *Day,* 370 U. S. 478, I joined Mr. Justice Harlan's opinion adding "patent indecency" as a further essential element of that which is not constitutionally protected.

There does exist a distinct and easily identifiable class of material in which all of these elements coalesce. It is that, and that alone, which I think government may constitutionally suppress, whether by criminal or civil sanctions. I have referred to such material before as hardcore pornography, without trying further to define it. *Jacobellis* v. *Ohio,* 378 U. S. 184, at 197 (concurring opinion). In order to prevent any possible misunderstanding, I have set out in the margin a description, borrowed from the Solicitor General's brief, of the kind of thing to which I have reference.[3] See also Lockhart and

----

[2] It is not accurate to say that the *Roth* opinion "fashioned standards" for obscenity, because, as the Court explicitly stated, no issue was there presented as to the obscenity of the material involved. 354 U. S., at 481, n. 8. And in no subsequent case has a majority of the Court been able to agree on any such "standards."

[3] ". . . Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material . . . cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. . . ."

McClure, Censorship of Obscenity: The Developing
Constitutional Standards, 45 Minn. L. Rev. 5, 63–64.

Although arguments can be made to the contrary, I
accept the proposition that the general dissemination of
matter of this description may be suppressed under valid
laws.[4] That has long been the almost universal judg-
ment of our society. See *Roth* v. *United States,* 354
U. S., at 485. But material of this sort is wholly dif-
ferent from the publications mailed by Ginzburg in the
present case, and different not in degree but in kind.

The Court today appears to concede that the materials
Ginzburg mailed were themselves protected by the First
Amendment. But, the Court says, Ginzburg can still
be sentenced to five years in prison for mailing them.
Why? Because, says the Court, he was guilty of "com-
mercial exploitation," of "pandering," and of "titillation."
But Ginzburg was not charged with "commercial ex-
ploitation"; he was not charged with "pandering"; he
was not charged with "titillation." Therefore, to affirm
his conviction now on any of those grounds, even if other-
wise valid, is to deny him due process of law. *Cole* v. *Ar-
kansas,* 333 U. S. 196. But those grounds are *not,* of
course, otherwise valid. Neither the statute under which
Ginzburg was convicted nor any other federal statute I
know of makes "commercial exploitation" or "pandering"
or "titillation" a criminal offense. And any criminal law
that sought to do so in the terms so elusively defined by
the Court would, of course, be unconstitutionally vague
and therefore void. All of these matters are developed
in the dissenting opinions of my Brethren, and I simply
note here that I fully agree with them.

---

[4] During oral argument we were advised by government counsel
that the vast majority of prosecutions under this statute involve
material of this nature. Such prosecutions usually result in guilty
pleas and never come to this Court.

For me, however, there is another aspect of the Court's opinion in this case that is even more regrettable. Today the Court assumes the power to deny Ralph Ginzburg the protection of the First Amendment because it disapproves of his "sordid business." That is a power the Court does not possess. For the First Amendment protects us all with an even hand. It applies to Ralph Ginzburg with no less completeness and force than to G. P. Putnam's Sons.[5] In upholding and enforcing the Bill of Rights, this Court has no power to pick or to choose. When we lose sight of that fixed star of constitutional adjudication, we lose our way. For then we forsake a government of law and are left with government by Big Brother.

I dissent.

---

[5] See *Memoirs* v. *Massachusetts, ante,* p. 413.