UNITED STATES of America, Plaintiff-Appellee,

v.

35 MM. MOTION PICTURE FILM Entitled "LANGUAGE OF LOVE," 12 Reels, 10342 Feet, English and Finnish Sound Tracks, Defendant,

Unicorn Enterprises, Inc. and Swedish Film Production Investment AB, Claimants-Appellants.

No. 902, Docket 34963.

United States Court of Appeals, Second Circuit.

Argued July 16, 1970.

Decided Sept. 14, 1970.

---

Ephraim London, New York City (London, Buttenwieser & Chalif, Franklin S. Bonem, New York City, on the brief), for claimants-appellants.

Michael C. Silberberg, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, New York City, David Paget, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

MOORE, Circuit Judge:

The film "Language of Love" in its present form arrived in New York on November 20, 1969 and was seized by the Commissioner of Customs on December 4, 1969. Thereafter a complaint was filed in the United States District Court for the Southern District of New York

by the United States Attorney alleging that the film was "obscene and immoral" and seeking an order for confiscation and forfeiture pursuant to the provisions of The Tariff Act of 1930, § 305, 19 U.S.C. § 1305. Unicorn Enterprises, Inc. and Swedish Film Production Investment AB filed a joint notice of claim and joined issue with the complaint in an answer contending that the statute, on its face, as administered and as applied in this case is unconstitutional, and that the film cannot be held "obscene" by current Constitutional standards.

After trial before Judge Pollack and a jury, the district court found the film obscene and ordered confiscation and forfeiture. On appeal, claimants continue the arguments made below in addition to certain contentions with regard to the evidence and allegations of error in the trial court.

"Language of Love," a Swedish-made film, is a movie version of the "marriage manual"—that ubiquitous panacea (in the view of some) for all that ails modern man-woman relations. Assuming the Masters and Johnson [1] premise that the path to marital euphoria and social utopia lies in the perfection and practice of clinically correct and complete sexual technology, this film offers to light that path in a way the masses can understand. It purports to be a veritable primer of marital relations, or perhaps the *Kama Sutra* of electronic media, although the film is nowhere nearly as rich in the variety of its smorgasbord of delights as comparison with that ancient Hindu classic might suggest.[2] It may be the vulgate scripture, the *Popular Mechanics,* of interpersonal relations, the complete cure for the ailing marriage. Or so goes the theory of its sponsors.

"Language of Love" stars four of what are apparently leading Scandinavian sexual technocrats, with brilliant cameo roles for the functioning flesh of various unnamed actors. Four doctors, including the Secretary General of the Swedish Royal Commission for Sex Education (who testified at the trial), an established Swedish gynecologist and family counselor, and a popular husband-wife team of pedigreed sexologists-psychologists who teach and lecture widely and write a syndicated newspaper column on the subject at hand, prepared the script informally by discussing love and marriage in depth before the camera. The camera then conscientiously probes the physical accomplishment of certain athletics (predominantly sexual intercourse) prescribed by the doctors to overcome the ills diagnosed in discussion in relatively brief film sequences interspersed throughout the seemingly interminable discussion. Towards the end of the film, a gynecological examination and the emplacement by a doctor of contraceptive devices in two young women are portrayed. An important sideline in the making of this film is said to be the airing of unhealthy inhibitions and the dismantling of taboos which interfere with the normal realization of sexual harmony. We may observe that all Scandinavian filmmakers appear bent on exploding our myths and taboos as at least a minor premise of their endeavors. See United States v. A Motion Picture Film Entitled "I Am Curious (Yellow)", 2 Cir., 404 F.2d 196, 203 (Ch. J. Lumbard, dissenting).

This film, as did *I Am Curious (Yellow),* contains scenes of oral-genital contact and other heterosexual activity that no actor or actress would ever have con-

---

1. Masters and Johnson, Human Sexual Response (1966).

2. The explicit scenes of sexual activity consist almost exclusively of normal heterosexual relations between adults in private. Female masturbation, cunnilingus (but not fellatio, *compare* "I Am Curious (Yellow)") and one fleeting instance of actual insertion are shown, but none of the bizarre aspects of sexual relations so fully described in, e. g., Memoirs of a Woman of Pleasure ("Fanny Hill"), see the dissenting opinion of Mr. Justice Clark in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts, 383 U.S. 413 at 441, 445, 86 S.Ct. 975, 16 L.Ed.2d 1.

fessed knowledge of in bygone days of the silver screen. Nevertheless, the movie-going public has been confronted with all of this before in recent times.

■ This film may be characterized by greater explicitness, quantitatively and qualitatively, than other films of this genre, although at least eight are currently playing or have recently played in New York without government interference, all of which could be said to have maximal explicitness and which enable that segment of the public interested in observing sexual activity in the quiet darkness of a movie theatre to do so. The government offers a comparison with *I Am Curious (Yellow)*, which we held not to be obscene, representing that the scenes of sexual activity in "Language of Love" are far more numerous and "shockingly explicit" than those in the former film. Whether that be true or not, and we note that certain types of sexual activity depicted in *Curious (Yellow)* are not present in this film, we do not intend to tally the instances and methods of sexual accomplishment and compare score sheets in dealing with these films. Here, as in the former case, our duty is to consider the manner in which sex is presented, not its frequency, variety or explicitness *per se*. 404 F.2d at 199.

"Language of Love" had apparently been scheduled for a premiere showing at a commercial theater in midtown Manhattan, and the record discloses no interest elicited or solicited from our medical institutions or universities. In fact, any documentary classification is expressly disavowed. The government introduced, over objection, an advertisement published in the trade magazine "Variety" offering for hire to film promoters "Language of Love" along with other films promising at least a modicum of redeem-

ing sexual impact for the operators of commercial movie houses. It is most unlikely that this film will be viewed primarily by marriage counselors and their patients in a professional setting. There is no evidence, however, of the manner in which the film will actually be promoted to the public except that the distributor has contracted to insure that no persons under 18 years of age will become privy to its dark secrets. It is described by its makers as a sex education film, produced for the edification of those members of the general public who experience a need for instruction in that sensitive area of their private lives. Presumably those who feel that they have been cheated can always seek a refund of the admission price.

The claimants presented a noted film critic, a principal researcher and author for the Kinsey Institute treatises on sexual behavior in both genders of the human species, a protestant minister and a former New York State chief film censor among its expert witnesses. All agreed that the film has social importance, and that it does not appeal to "prurient interest" in their understanding of that much-debated term. All likewise agreed that the film's explicitness falls within the customary limits of candor tolerated by the national community in view of the currently available competition for the movie-goers' dollars.

The government presented very little evidence beyond the film itself for assistance in determining the obscenity *vel non* of the film. The jury retired for deliberation with instruction to find in special verdict form whether or not the film, taken as a whole, was (1) in its dominant theme an appeal to prurient interest, (2) patently offensive, and (3) utterly without social value.[3] After 40

---

3. The jury was instructed to answer "Yes" or "No" to three interrogatories in the following form:

Has the government established by a fair preponderance of the credible evidence that:

(1) The dominant or overriding aspects of the film, considering it as a whole, appeal to and tend to excite lustful or lascivious thoughts, desires or sexual reaction and a morbid interest in sex in the average person. (2) The manner of portrayal of the material in this film goes substantially beyond prevailing community

minutes of deliberation, the jury sent the judge a note asking: "If a vote on questions No. 1 and No. 2 are yes, and question 3 is no, will this picture be shown and the government case lost?" The court returned an answer in the affirmative, to the formulation of which claimants' counsel consented and that exchange is not appealed. Three more hours of deliberation produced a "yes" answer to all three questions. The trial court denied claimants' motion for a directed verdict and entered judgment for the government, ordering forfeiture and confiscation of the film.

Although other constitutional and evidentiary questions are presented on appeal from the judgment, we heard oral argument only on the issue of obscenity *vel non*, and we reverse on that basis. Claimants' position is that "Language of Love" cannot constitutionally be excluded from the country as "obscene" because its dominant appeal is not to prurient interest but to sexual enlightenment, and because of the little controverted evidence of social importance. We have examined the record and viewed the film in its tedious entirety, and we hold that "Language of Love" is not proscribably obscene within the meaning of at least two of the Memoirs v. Massachusetts [4] coalescing trilogy of factors.

*Who is to decide?*

◼ At the outset we confront the fact that our judgment differs from that of the jury on questions which were put to them specifically and on which they rendered unanimous verdicts. What weight should the jury's verdict carry? Who is to decide that a work is of such quality as to be ineligible for constitutional protection? These questions have been the subject of extended consideration by the Justices of the Supreme Court and at least at the present time have been resolved, although not without dissent. Mr. Justice Harlan in *Roth* said:

"On this basis the *constitutional* question before us simply becomes, as the Court says, whether 'obscenity', as an abstraction, is protected by the First and Fourteenth Amendments, and the question whether a *particular* book may be suppressed becomes a mere matter of classification, of 'fact', to be entrusted to a fact-finder and insulated from independent constitutional judgment. But surely the problem cannot be solved in such a generalized fashion. Every communication has an individuality and 'value' of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as 'obscene', for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind. Many juries might find that Joyce's 'Ulysses' or Bocaccio's 'Decameron' was obscene, and yet the conviction of a defendant for selling either book would raise, for me, the gravest constitutional problems, for no

---

standards of candor and frankness and is patently offensive for general public showing to adult audiences.

(3) The film, when all of it is considered as a whole, is rendered utterly without social value.

4. 383 U.S. 413, 86 S.Ct. 975 (1966).

such verdict could convince me, without more, that these books are 'utterly without redeeming social importance'." 354 U.S. 476 at 497–498, 77 S.Ct. 1304, at 1315–1316, 1 L.Ed.2d 1498.

In *Jacobellis,* the Supreme Court clearly accepted the responsibility of being the ultimate arbiter, Mr. Justice Brennan writing:

"We are told that the determination whether a particular motion picture, book, or other work of expression is obscene can be treated as a purely factual judgment on which a jury's verdict is all but conclusive, or that in any event the decision can be left essentially to state and lower federal courts, with this Court exercising only a limited review such as that needed to determine whether the ruling below is supported by 'sufficient evidence.' The suggestion is appealing, since it would lift from our shoulders a difficult, recurring, and unpleasant task. But we cannot accept it. Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees. Since it is only 'obscenity' that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law. See Roth v. United States, *supra,* 354 U.S. at 497–98, [77 S.Ct. 1304] (separate opinion). Such an issue, we think, must ultimately be decided by this Court. Our duty admits of no 'substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.' *Id.* at 498, [77 S.Ct. at 1316]; see Manual Enterprises, Inc. v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639 (opinion of Harlan, J.). 378 U.S. 184 at 187–188, 84 S.Ct. 1676 at 1678, 12 L.Ed.2d 793."

Dissenting, Chief Justice Warren thought that the test on review should be to apply a "sufficient evidence" test to the fact findings of appropriate State and Federal courts as " * * * the only reasonable way I can see to obviate the necessity of this Court's sitting as the Super Censor of all the obscenity purveyed throughout the Nation."

In *I Am Curious (Yellow)* this court did not allow a jury's verdict to remain as the controlling factor in its reversal. In his opinion, concurring with Judge Hays, Judge Friendly wrote concerning Chief Judge Lumbard's dissenting opinion upholding the role of the jury and the finality of their verdict:

"This has its attractiveness, if only in relieving busy appellate courts from having to spend so much time on cases like this. See O'Meara & Shaffer, Obscenity in the Supreme Court: A Note on Jacobellis v. Ohio, 40 Notre Dame Lawyer 1 (1964). But I find little support for his thesis in the many opinions of members of the Supreme Court during the last decade. Even Chief Justice Warren's more moderate statement in dissent in Jacobellis v. Ohio, supra, 378 U.S. at 202–203, 84 S.Ct. at 1686, that he would subject the judgments of lower courts 'to a consideration only of whether there is sufficient evidence in the record upon which a finding of obscenity could be made,' was concurred in solely by Mr. Justice Clark. Squarely to the contrary are Mr. Justice Harlan's observations in dissent in Roth v. United States, supra, 354 U.S. at 497–498, 77 S.Ct. 1304, and in speaking for himself and Mr. Justice Stewart in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), and Mr. Justice Brennan's expressions for himself and Mr. Justice Goldberg, joined in this respect by Mr. Justice Harlan, in Jacobellis v. Ohio, supra, 378 U.S. at 189–190, 203, 84 S.Ct. 1676. Placing the decisional task upon judges is a natural consequence of the emphasis on 'a national standard of decency,' Manual Enterprises v. Day, supra, 370 U.S. at 488, 82 S.Ct. 1432 (Harlan, J.), and Jacobellis v. Ohio, supra, 378 U.S. at 194–195, 84 S.Ct. 1676 (Brennan, J.), a principle peculiarly applicable to a federal statute governing the exclusion

of a film from the entire United States. Likewise the jury has no special competence on the issue of 'redeeming social value'." 404 F.2d at 201–202. Also see *id.* at 199.

If the Supreme Court chooses not to abdicate its responsibility in deciding obscenity as a matter of fact, neither should this court although it be only an intermediate waystation in the appellate review process. Thus, the primary burden of rendering the "constitutional judgment" required in obscenity cases as the law now stands rests upon this court, and the verdict of the jury can only be an advisory opinion at best. Thus we proceed to the constitutional issue which is ours for decision in the case at bar.

### Prurient Interest

In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304 (1957), Mr. Justice Brennan stated for at least five members of the Court the rather clear proposition that "sex and obscenity are not synonymous." 354 U.S. at 487, 77 S.Ct. at 1310. Abandoning the clarity of that simple negative declaration, he shifted to the affirmative: "Obscene material is material which deals with sex in a manner appealing to prurient interest." Clues to the character of a "prurient interest," as opposed to a mere sexual interest, were included in the accompanying footnote seeking to explain the scope of the term of art which was to become a fixed and immutable requisite for a finding of obscenity. The definitional terms were words such as "lustful," "itching, morbid or lascivious," and "lewd," all of which connote a sense of debasement, of subnormal furtiveness or guilt. The clearest statement excluding normal sexual desire or libidinal arousal was the substitute for "prurient interest" offered by the drafters of the American Law Institute Model Penal Code (Tent. Draft No. 6, 1957), quoted with apparent approval in the footnote. The Model Code characterized an obscene thing as one whose "predominant appeal is to be a prurient interest, i.e., a *shameful or morbid* interest in nudity, sex or

excretion, \* \* \*." *Id.* at 487 n. 20, 77 S.Ct. at 1310 (emphasis added).

To our knowledge, nothing that the Supreme Court has said subsequent to *Roth* would alter the restrictive definition of "prurient interest" contained in that footnote. We conclude, therefore, that the Supreme Court has never intended to brand as "obscene" representations of sexual matters which do not import a debasing, "shameful or morbid" quality into the expression or depiction of human sexuality. To conclude otherwise would be *to suggest that the human body and its functions are in themselves somehow "dirty" or unspeakably offensive.* There is no logic in such a position, and we reject it.

All of the expert witnesses testified that the scenes of sexual activity in "Language of Love" do not, nor were they calculated to, appeal to a morbid or shameful interest in nudity or sex. The film portrays normal heterosexual relations albeit in rather graphic detail, one sequence of female masturbation, and closeups of the examinations performed by the gynecologist. Several sequences in the film we found offensive, not because they excited predilections to prurience but because they intruded upon areas of interpersonal relations which we consider to be peculiarly private. Our sensibilities were offended, but that is a matter of taste and *de gustibus non disputandum est,* particularly in matters of sex and constitutional law. Whatever considerations of taste are appropriate in an adjudication such as this fall within the element of "patent offensiveness to prevailing community standards," and offensiveness alone is not a sufficient ground for censorship under the prevailing law of obscenity. Memoirs v. Massachusetts, *supra.* To the average person, certain scenes in "Language of Love" may present a temporary erotic appeal, and the effect may be temporary sexual arousal. The bodies of attractive young persons may well have an erotic appeal, and we cannot ignore that fact. Indeed erotic appeal has assumed a position of paramount importance, somewhat

overemphasized we think, in the affairs of our daily lives. The dominant theme of present-day advertising, taken as a whole, appears to be an appeal to arousal of the consumers' sexual interest. If the arousal of sexual appetite is equated with an appeal to "prurient interest," it might be necessary to hale into court our leading couturiers, perfumers, and manufacturers of soft drinks, soap suds and automobiles. Of course the standards of taste applicable to advertising differ considerably from those of literature and films shown behind closed theater doors, and quite properly so because television and magazines published for general circulation have a vast potential for intruding into the home and affronting the sensibilities of the unsuspecting.

If prurient interest is to be defined as having lascivious thoughts, how can such a subjective determination be made? The young man meeting an attractive young lady, who seeks admission into this country and who may eventually become his wife, may well, as a normal young male, have lascivious thoughts calling for proper and decorous restraint. Query, should she be denied entry? And what of the scores of objects cited by Kraft-Ebbing and others calculated to arouse such thoughts in certain people affected thereby? The shades of many stores along the avenue featuring briefer bikinis and minier minis might all have to be drawn.

The erotic instinct and the apparent desire for sex education are in the ascendancy in our society, and in the sensitive area of constitutional adjudication of individual rights we must be careful to distinguish between the arousal of sexual instincts and the perversion of those instincts to morbidity. That, we believe, is essential to the wisdom of the Supreme Court's attempts to keep the "door barring federal and state intrusion into [the area of first amendment freedoms] tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests," as long as government chooses to remain in the distasteful business of censorship. *Roth, supra,* 354 U.S. at 488, 77 S.Ct. at 1311. Since presentation of the sexual matter in this film is not characterized by the forbidden "leer of the sensualist," *Ginzburg v. United States,* 383 U.S. 463, 468, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), we do not believe the film as a whole can be considered an appeal to prurient interest.

*Redeeming Social Value*

The overriding aspect of the *Memoirs* formula appears to have become, in most cases (as indeed it was in *Memoirs* itself), the presence or absence of the "required modicum of social value," *I Am Curious (Yellow), supra,* 404 F.2d at 201 (concurring opinion) and the dominant theme of a film or its revealed purpose is important in determining the existence of social value as well as the nature of the film's appeal. Claimants and their witnesses assert that the theme of "Language of Love" is sex education, or sexual enlightenment, and the film itself bears that interpretation. Perhaps uniquely in litigation of this sort, we are not confronted with any difficulty in perceiving a "nexus" between the sex activity and what is claimed to be the legitimate purpose of the filmmaker. Compare *I Am Curious (Yellow), supra,* at 199. Some mention of sex can hardly be said to be extraneous in a film which is "about" sex, and the social value of this film in particular stands or falls on its presentation of sexual matter, for there is nothing else. Regardless of the caliber of the editing, which in many places is rather crude, it cannot be said that the scenes of graphic, explicit physical activity were simply injected into the film with no relation to the theme, for the sociological, medical and psychological discussions which comprise over three-quarters of this film are about precisely what takes place sexually between the partners.

Ideas *are* presented in this film—ideas about sex—and the jury seemed to recognize that fact when it revealed its distaste for the prospect that the picture would "be shown and the government

case lost" if it were to acknowledge any social importance.[5] There is without question a widespread interest in the physiology and psychology of sex today.[6] There has always existed in some a lascivious, morbid or pathological interest in the physical details of sex, but the clinical aspects of mature sexual relations have become increasingly of interest to many who are concerned scientifically, morally, ethically and sociologically with the effect of sex relations on human relationships and the problems attending the fact that there are two sexes, each interesting to the other in large part because of the potential for sexual enjoyment. This film purports to examine and dramatize candidly certain marital difficulties said to beset present-day society, and to reveal the potential for sexual harmony. We found the discussion tedious and the dramatization rather too clinical for our tastes; neverthless, the dominant theme is the revelation and solution of sexual problems, and the authors and principals are not "leering sensualists." "Sex, a great and mysterious motive force in human life, has indispu-

tably been a subject of absorbing interest to mankind through the ages; * * *," *Roth, supra,* 354 U.S. at 487, 77 S.Ct. at 1310. Whether or not we agree that the theories and solutions presented in "Language of Love" accurately plumb the depths of that "mysterious motive force," the film constitutes "material dealing with sex in a manner that advocates ideas," Jacobellis v. Ohio, 378 U.S. 184, 191, 84 S.Ct. 1680 (1964), and the First Amendment protects the expression of ideas regardless of medium or subject. However simplistic or incomplete we may find these doctors' treatment of humanity, their efforts and those of the filmmaker could not be rendered "utterly without redeeming social value" by virtue of our disagreement or distaste. Thus, on at least two grounds "Language of Love" cannot be proscribed as obscene within the meaning of *Roth* as explicated in *Memoirs.*

▉ Having said all this, we recognize that this film may lend itself to "exploitation of interests in titillation * * * through [its] pervasive treatment or description of sexual matters," *Ginzburg,*

5. Among the ideas which the jury apparently found offensive was the Swedish approach to sex education in the schools with regard to contraceptives. One sequence portrays Dr. Maj-Briht Bergstrom Walan, one of the female participants in the general panel discussion, explaining the uses and attributes of three different contraceptive devices to a coeducational group of seemingly teenagers in a classroom. During their deliberations, the jury sent a note to the judge asking "the age group or grade level of the students in the classroom." That question obviously has no conceivable relevance to any of the questions the jury was charged with deciding, other than perhaps "offensiveness," and again points up the questionable validity of any jury's judgment on such a difficult and sensitive constitutional matter. It should also demonstrate why the burden of independent judgment is clearly ours. See the discussion of the court's role vis-a-vis the jury, *supra.*

6. Four years ago, in United States v. One Carton Positive Motion Picture Film Entitled "491," 367 F.2d 889, 897 (2d Cir. 1966), we took note of the popularity

with the general public of the Masters and Johnson book, Human Sexual Response, *supra,* note 1, which records "the response of hundreds of people, wired on virtually every section of their anatomy to electrical recording devices, while they perform their sexual functions, naturally and artificially, under Kleig lights before a medical group noting, cataloging and analyzing their every reaction." The book was at that time third on the Best Seller List of the New York Times Book Review. *Id.* at 897 n. 4. The proliferation of books and articles in the general area of human sexuality by general practitioners, psychiatrists and psychologists, theologians and humorists, as well as manuals and films like the present one for laymen in the past five years would indicate that the breadth of interest we discerned then has shown no signs of abating. Masters and Johnson, Human Sexual Inadequacy, is presently No. 6 on the Best Seller List, the No. 1 spot being occupied by Reuben, Everything You Always Wanted to Know About Sex, Third on the list is "J," The Sensuous Woman, New York Times Book Review, Section 7, page 25, The New York Times (Sunday, July 26, 1970).

*supra,* 383 U.S. at 475–476, 86 S.Ct. at 950. Under the rule of *Ginzburg,* protestations of high purpose will not avail the distributors of such a film against evidence presented by local prosecutors that the context in which it is presented to the public amounts to "pandering." *See Ginzburg, supra* at 474–476, 86 S.Ct. 942; *Memoirs, supra,* 383 U.S. at 420, 86 S.Ct. 975. State courts may determine that this is a "close case," in which "evidence of pandering may be probative with respect to the nature of the material in question. * * *" *Ginzburg, supra* 383 U.S. at 474, 86 S.Ct. at 949. Attempts to unlawfully exploit salacious appeal are presently punishable by the States and under the federal mail statute and, regardless of what we say here, in future prosecutions "[e]vidence that the [film] was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the [film] was utterly without redeeming social importance." *Memoirs, supra* 383 U.S. at 420, 86 S.Ct. at 978. In such a case the focus is largely on the conduct of the distributor, and his evaluation of the material is relevant in determining his purpose.

This, of course, is not a criminal prosecution but a civil proceeding against the film itself to determine whether it may be imported into the country for any purpose at all. The Supreme Court has noted that a criminal conviction on the theory of *Ginzburg* "does not necessarily suppress the materials in question, nor chill their proper distribution for a proper use." 383 U.S. at 475, 86 S.Ct. at 949. Our case is not a narrowly directed criminal prosecution, and forfeiture pursuant to § 305 would suppress the material entirely and condemn it in all contexts. This the First Amendment forbids unless the material itself is proscribably obscene. Thus the evidence of the "Variety" advertisement introduced by the government at trial was irrelevant. The Supreme Court expressly recognized the distinction between a proceeding such as this one and a criminal prosecution for conduct violating the mail statute. See *Ginzburg, supra,* at 474 n. 15, 86 S.Ct. 942. Moreover, the "Variety" advertisement does not establish the manner in which the distributors will promote this film in the future. The ad was placed in a trade magazine, not a publication for general public distribution. It was aimed at distributors, not the public, and it advertised "Language of Love" in particular only on the basis of box office figures in Sweden. The ad presents as a drawing a naked young lady exceptionally well endowed fore and aft and the titles of various motion pictures available to potential exhibitors. The format of the ad may have suggested that "pandering" promotion would be profitable and might occur in the future, but it provides no context of present pandering, nor does it support an inference that the film "was created or exploited entirely on the basis of its appeal to prurient interests." *Id.* at 474, 86 S.Ct. at 949. Therefore, even if the principle of *Ginzburg* were applicable constitutionally, the ad was of no probative value in this proceeding. Such proof must be reserved for criminal or State proceedings subsequent to distribution.

■ A second limitation on our decision to allow this film to cross our borders is the recognized power of the States to "adjust the definition of obscenity" for minors. Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). If the film is shown to minors, even though it cannot be proscribed as "obscene" by adult standards, a prosecution may succeed under a statute which reflects "a specific and limited state concern for juveniles." Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967). Thus our holding may be limited to exhibition for adults only, and the distributor has indicated his intention to exhibit the film with that limitation.

Finally, although the jury found that the explicitness of the sexual portrayal in this film "is patently offensive for general public showing to adult audi-

ences," [7] we perceive no implicit danger of an "assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it." *Redrup, supra,* at 769, 87 S.Ct. at 1415. If such a context were to present itself, the exhibition of this film under those circumstances could be halted notwithstanding the fact that it is not legally "obscene" by current Supreme Court standards. For example, the advertising on theater marquees for a film like the present one could emphasize certain aspects of its contents graphically in such a way as to offend the unsuspecting passerby; likewise the outdoor theater with its screen visible from the highway or the homes of neighbors. These considerations suggested in *Redrup* overlap to an extent with the Court's concern over the "indiscriminate mailings" of literature advertising the publications which were the subject of the decision in *Ginzburg,* and may be thought to underly that decision in part.

■ Certainly what is private and what is public is a relative evaluation. Viewing a film with an audience of 300 persons is obviously not entirely private. Nevertheless, the viewing "public" embraces only those who, having read or seen the advertisements or bill of fare offered at the theater, affirmatively moved to enter the theater at what is frequently a premium price. Therefore, it is not the general public which is exposed to the scenes deemed offensive in a movie such as this one, but a highly specific "public" composed of individuals who have freely chosen to present themselves for exposure. See Karalexis v. Byrne, 306 F.Supp. 1363, 1365 (D. Mass.1969) (opinion of Aldrich, C. J., for a three-judge district court). Few

of this film's patrons, given its specific subject matter, could complain that their sensibilities were shocked when taken unawares by the film's explicitness. Local authorities can certainly enforce regulations requiring "truth in exhibition" by the local exhibitor at the theater door to insure against affronts to the unsuspecting citizen.

We say all this to emphasize that the local communities are not without protection against the swelling tide of "entertainment" which exceeds their own limits of decency in the portrayal of both sex and violence. As a federal court charged with the delicate responsibility of guarding the First Amendment's guarantee of free expression, we cannot interdict at the border, and for all purposes, a film which does not meet the rigid criteria established by the Supreme Court as the *sine qua non* for suppression. And putting aside for a moment the intricacies of the *Memoirs* formula, whatever "hardcore pornography" is, "Language of Love" considered as a whole is simply not of that genre.

In final analysis is freedom of speech and expression, including exhibition of motion picture films, to be based on the opinions of 51 percent or even 80 percent of our populace? If so, it might well be that on a national plebiscite the "Language of Love," "I Am Curious (Yellow)" "Les Amants," "Memoirs" and others would all be condemned by a majority vote. Minorities woud then read and see what their fellow men would decide to permit them to read and see. The shadow of "1984" [8] would indeed be commencing to darken our horizon.

In conclusion, a simple standard could easily be judicially created as a matter of law, namely, that any motion picture film which reveals two persons, male and

---

7. We do not consider here whether this film meets the criterion for patent offensiveness, since we have found it not to be "obscene" in other respects. We do not, therefore, attempt to assess the "contemporary community standards relating to the description or representation of sexual matters," which in a case of this sort, at least, are national standards. Manual

Enterprises v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 1437, 8 L.Ed.2d 639 (1962). Judging by the current fare in New York, however, this film is going to be hard pressed to match the level of candor of its competition.

8. G. Orwell, 1984 (1949).

female, engaging in actual or simulated sexual intercourse in an accepted normal manner (*a fortiori* any variations thereof) does not qualify for entry into this country. In view of the change in attitude regarding public treatment of sexual problems in foreign countries, this might well place us in an isolationist position amongst the nations. If such a position is deemed necessary to protect our own moral standards, there is no reason why we should not repel assaults thereon by those of differing beliefs. With equal composure we can ban all sex education for the young and in the schools. A large segment of our population would applaud such restrictions as they now vigorously oppose any entry into this field. However, we do not read the decisions of the Supreme Court as entitling the courts to assume this role. Whether these decisions will bring forth a more enlightened people who have lived long under sex taboos or will cause a moral degradation of the race will be for the historian.

We therefore reverse and order the confiscated materials released to the claimants.