**UNITED STATES of America**
v.
**NEW ORLEANS BOOK MART, INC. and Fred Lund.**

**UNITED STATES of America**
v.
**PEACHTREE NEWS COMPANY, Inc., New Orleans Book Mart, Inc., Robert Mitchum, and Frederic Eno-Mayhew Lund.**

**UNITED STATES of America**
v.
**GRAVIER STREET BOOK MART, Michael G. Thevis, John C. Martin, and Peachtree News Company, Inc.**

**UNITED STATES of America**
v.
**Michael George THEVIS, Peachtree News Company, Inc., Frederic E. Lund, and New Orleans Book Mart, Inc. (two cases).**

**UNITED STATES of America**
v.
**Steve SCOTT.**

**Crim. A. Nos. 32093, 32215, 32216, 32225, 32226, 32188.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 10, 1971.

138

Michael Ellis, Asst. U. S. Atty., for plaintiff.

Jack Peebles, Metairie, La., for defendants.

RUBIN, District Judge:

Defendants, indicted for transporting obscene materials in interstate commerce, in violation of 18 U.S.C. §§ 1462 and 1465, assert that the materials cannot be considered obscene under the First Amendment, and, that the statutes are unconstitutional for a variety of reasons. An abundant record has been made. Those materials contended to be obscene are seventeen paper cover, magazine type, printed publications featuring photographs of nude persons and two movies.

Some of the publications deal principally with females, some with males, and others are heterosexual. Those featuring females have some photographs of single females, but each also has photographs of several females together or of females and males together in poses that depict sexual activity or suggest it in terms so explicit that nothing is left to the imagination.[1]

A few of the publications featured photographs of nude males, frequently adolescent boys, sometimes displaying penile erections. Only one publication, however, had photographs of one person alone. This was called "Auto Fellatio and Masturbation", and featured photographs of men engaged in practicing fellatio on themselves, or in the apparent act of masturbation.

Each party presented witnesses expert in psychology and psychiatry. None of the witnesses indicated that the publications would be without effect on the viewer. However the defense witnesses thought the effect would be sexual arous-

---

1. Thus, one defense witness testified that a particular photograph did not "depict" cunnilingus but only "suggested" it. This is a photograph of a nude female, with photographic focus on her genital area, showing a male head and face a few inches away, mouth open and tongue out. There are similar "suggestions" in each of these publications of some other kind of sexual activity, each featuring some specific sexual appetite, such as sadism, sodomy, fellatio, homosexuality or lesbianism.

al of short duration. They noted no inconsistency between considering the effect of these photographs transient and without impact on the viewer's future intellectual and social life and the conventional age old supposition that we learn from what we see and read, and that ideas thus imparted can become a permanent part of one's intellect and produce a lasting effect on his life. The defense witnesses indicated that, accompanied with proper treatment, the publications could have a permanent beneficial effect on married couples with sexual problems.[2]

In sum, the defense witnesses testified that they did not consider the publications obscene;[3] to the extent the photographs influenced conduct in any lasting way, the influence was beneficent; and they did not consider that any of the publications would stimulate the viewer to commit a sex crime. A few persons might be shocked by seeing these pictures, but, with therapy from the witnesses, this would produce no lasting ill effects.

However, the defense witness whose testimony was most persuasive, a practicing psychiatrist, thought that some viewers might be encouraged to perform sexual acts they would otherwise not attempt as a result of seeing such photographs. Being allowed to purchase and see photographs of this kind would imply to some persons, this witness said, societal sanction for a type of conduct the individual might otherwise consider forbidden.

The prosecution witnesses found some of the photographs in each publication obscene. They thought the photographs might stimulate persons who had latent sexual problems to "act out" their desires in a manner that would be criminal. They did not think that seeing the photographs would cause a normal person to commit a criminal act.

It was evident that, while these witnesses for both defense and prosecution testified as experts, many of them viewed their roles as advocates. All but one or two had *a priori* convictions concerning the undesirability or desirability of legislation in this area, and their primary interest was either in attacking or defending it. "Having in most cases chosen their sides as moralists," as Murray Kempton said in reviewing the Report of the Presidential Commission on Obscenity, "they seemed to feel the need to present themselves as utilitarians and to give weight to dubious research which, as practical men, they would be embarrassed to claim as the basis for sound principle." [4]

The Report of the Commission on Obscenity and Pornography ("The Report") was introduced and commented on by various witnesses. The findings of a majority of the Commission, as Mr. Kempton notes, "permit and indeed encourage the inference that," as the defense witnesses testified, "pornography, if it can be said to have an effect at all, tends to be good for you." Ibid.[5]

Considering the Report and all of the testimony, there is at this time no con-

---

2. These witnesses said they showed similar publications to married couples with sexual problems as a means of reducing their inhibitions and encouraging experimentation in sexual activity. One reported that, assisted with the use of such photographs, his treatment enabled female patients who had never experienced an orgasm to have such a sexual experience after only a week or so of therapy. The testimony implied that these inhibition releasing, climax producing results are permanent in nature, as distinguished from the transient sexual arousal awakened when the photographs are viewed without therapy.

3. One or two witnesses were unable to utilize this legal term as a method of classification.

4. Kempton, "A Feelthy Commission," New York Review of Books, November 19, 1970, p. 24.

5. In fact, the portrait of the pornography patron painted by the Commission would seem to be one many would aspire to. The Report states that customers of "adult movie theaters manifest a good deal of upward sexual mobility." Report, p. 165. Those who buy the picture publications at adult bookstores are "predominantly white, middle-aged, middle

vincing scientific proof that pornography is or isn't harmful. Indeed, the dissenters on the Commission thought that it is "doubtful that we will ever" have such proof "because of the extreme complexity of the problem and the uniqueness of the human experience. * * *" Report, p. 489.

When, in 1873, under the influence of Anthony Comstock, see dissent of Mr. Justice Douglas, in Ginsberg v. N. Y., at 390 U.S. 629 at 654, 88 S.Ct. 1274, 20 L.Ed.2d 195, Congress enacted the statute under which the defendants were indicted, it had none of this evidence before it. It acted on the basis, presumably, of an intuitive judgment much like Nietzsche's, "He who gazes on monsters should beware lest he become a monster himself."

There can be no doubt that the statute is moralistic; it is predicated on the hypothesis that chastity and conventionality in sexual relations are desirable, that viewing photographs or reading materials that encourage sexuality are undesirable, and that the law ought to punish things that might encourage deviation from conventional sexual behavior. In terms it identifies an obscene publication by labeling it lewd and filthy; it equates such a publication with other matter of an indecent character.

The Report considered that legislation in this area ought to be narrowly restricted. But this court may not concern itself with whether the statute is wise; the only questions are whether the Constitution prevents the court from finding these materials obscene or if it does not, whether it forbids Congress to enact this law. This decision must turn on the First Amendment, not merely on questions of logical relevance to the end sought and other issues that might be considered were we concerned only with due process.

class males, most of whom present the physical appearance of economical success and social respectability." Report, p. 293. " * * * [P]ersons who are more experienced recently with erotic materials * * * are more supportive of First

## I. ARE THE PUBLICATIONS CONSTITUTIONALLY NON-OBSCENE AS A MATTER OF LAW?

Despite the plethora of obscenity cases that have inundated the Supreme Court since the premier decision in Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, a majority of the Justices have never agreed on a definition of obscenity or on criteria that enable a court to determine what is obscene. However, some of the justices have indicated that, before material can constitutionally be classified as obscene, it must be submitted to every one of three tests: First, the dominant theme of the material taken as a whole must appeal to a prurient interest in sex. Second, the material must be patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. Third, the material must be utterly without redeeming social value. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 1966, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1.

■ In applying these tests, the court is obliged to make an independent constitutional judgment as to whether the material involved is constitutionally protected. Jacobellis v. Ohio, 1964, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793.

In oral findings of fact at the conclusion of the hearing, I commented on each of the publications at length. It would be redundant to repeat those comments here. However, a few more general observations may be pertinent.

### A. Prurience

The defense witnesses think that none of the photographs in any of the seventeen publications appeal to a prurient interest. They define "prurient appeal" as a morbid or sick appeal; they say that

Amendment rights * * * and more active in local and national politics. They are also more highly educated and more frequently read books and magazines." Report, p. 236.

the pictures do not appeal to a sick interest but to normal sexual curiosity. These witnesses considered that human curiosity about seeing the portrayal of sex acts, however deviant or morbid the act itself might be, is a normal emotion. Of course, if it is normal to be curious about aberrational conduct, nothing could appeal to "prurient interest." Some of the defense witnesses testified that the pictures would have a morbid appeal only to people who are themselves emotionally diseased. Persons whose psychosexual lives are warped would find a morbid appeal in some of these photographs but this would not harm even these emotional cripples; the photographs would be a crutch in their hermitic sex lives.

The word "prurient" was defined in footnote 20 to the opinion in Roth v. United States, 1957, 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498, to lack "significant difference" from the definition in the A.L.I. Model Penal Code, § 207.0(2) (Tent.Draft No. 6, 1957): "a shameful or morbid interest in nudity, sex or excretion." These definitional terms are all pejoratives: "shameful" is defined by the dictionary as "disgraceful or indecent", "morbid" means "psychologically unhealthy." Each definition in turn invites another, subjective and invidious.

The word "prurient" itself implies a value judgment. Like many other words used in law to express social worth or lack of worth, to distinguish legally acceptable from legally unacceptable conduct, it cannot be precisely defined or reduced to synonyms susceptible of objective application. Like the philosophical search for a criterion of truth, the effort to define what is "negligence," or what is "due process of law," or, indeed what is "justice," the quest is endless. For the word used as a touchstone itself sums up a societal judgment.

Of course, in dealing with terms of this nature, resort to other words, helps to turn our attention in the intended direction; to indicate the kind of thing that is likely to pass or fail the legal test. Thus our thoughts are thrust in the direction contemplated by the statute by the linguistic contrast of something that is likely to be considered shameful by most members of the community with something that is likely to be considered proper. A picture is not to be condemned merely because it would offend a prude. But it is not to be considered nationally acceptable merely because there are some who are so tolerant that they can never be offended.

■ The intermediate and proper standard is that of the national contemporary community as a whole. Viewed in the combined light of the witness' testimony, some modest familiarity with psychological and physiological research of the sort done by Kinsey, and by Masters and Johnson, as well as with the psychiatric literature, the photographs in question are sufficiently prurient in my judgment for me to think that it does not violate the Constitution, as interpreted in Roth, for Congress to legislate against their transportation in interstate commerce for the purpose of commercial sale.

■ Even after ample allowance for the variety of sexual practices engaged in by mankind, and for the different partners chosen for sexual purposes, photographs that appeal to interest in (or at least curiosity about) sadism in graphic terms appear to me to be prurient. Photographs that depict oral manipulation of a person's own penis, photographs that contain explicit suggestions of sodomy and lesbianism are all prurient, even if there are some for whom these practices are in psychiatric terms normal. Indeed, when "the material is designed for and primarily disseminated to a clearly defined deviant sexual group, * * * the prurient appeal requirement of the Roth test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group." Mishkin v. N. Y., 1966, 383 U.S. 502, 508, 86 S.Ct. 958, 963, 16 L.Ed.2d 56.

## B. Patent Offensiveness

■ It cannot be doubted that, as the defense witnesses testified, the kind of material involved in these cases is widely distributed. That there is a market for the material does not mean that it does not affront contemporary standards. My own judgment is that the material is sufficiently offensive on its face to affront national standards with regard to the description or representation of sexual matters.

The Supreme Court, in a host of per curiam decisions [6] has held constitutionally protected photographs of nudes featuring emphasis on the genital area. But none of its decisions supports the thesis that the national community now accepts photographs depicting men *and* women engaged in fellatio and cunnilingus, boys with erect penises, males suggesting sex acts with other males, or females suggesting sex acts with other females. The swinging single may be all right, but doubles still don't go. See Hunt v. Keriakos, 1 Cir. 1970, 428 F.2d 606.

## C. Redeeming Social Value

While the prosecution witnesses saw no redeeming social value in the photographs, the defense witnesses found some such merit in each of them. They said the materials were entertaining. They satisfied curiosity. In the hands of a therapist, they could be used to educate people. While some of these witnesses said they considered some of the material obscene, they perceived no valid legislative reason to act against even these materials.

These photographic materials lack any intellectual content. They cannot be said to appeal to any idea or ideology, however offensive. It is of little moment that they might be put to good use in the hands of an educator; in the hands of the defendants they were intended neither for treatment nor education. In essence, the case for their worth is that they have a market; social value is made the equivalent of market value.

■ It may be "entertaining" to satisfy a prurient interest in sex, but that does not constitute redeeming social value. Ultimately "redeeming social value" is not found solely on the face (if one can put it that way) of the photographs. It may arise from the use made of them. A photograph depicting actual sexual actions, conventional or unconventional in nature, might serve a useful purpose in the hands of a therapist. But it is implicit in the obscenity statutes that what is permitted for a therapeutic use might be proscribed when put to some other purpose. Cf. Davis v. United States, 6th Cir. 1933, 62 F.2d 473, and cases cited therein. Therefore we must

6. Federal Cases Involving Federal Statutes: Central Magazine Sales Ltd. v. United States, 1967, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49; Potomac News Co. v. United States, 1967, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46; Books Inc. v. United States, 1967, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311; Aday v. United States, 1967, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed. 1309. Cases Involving State Statutes: Bloss v. Dykema, 1970, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230; Conner v. City of Hammond, 1967, 389 U.S. 48; Felton v. Pensacola, 1968, 390 U.S. 340, 88 S.Ct. 1098, 19 L.Ed.2d 1220; Ratner v. California, 1967, 388 U.S. 442, 87 S.Ct. 2092, 18 L.Ed.2d 1304; Friedman v. New York, 1967, 388 U.S. 441, 87 S.Ct. 2091, 18 L.Ed.2d 1303; Keney v. New York, 1967, 388 U.S. 440, 87 S.Ct. 2091, 18 L.Ed.2d 1302; I. M. Amusement Corp. v. Ohio, 1968, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776; Robert Arthur Management Corp. v. Tennessee, 1968, 389 U.S. 578, 88 S.Ct. 691, 19 L.Ed.2d 777; Schackman v. California, 1967, 388 U.S. 454, 87 S.Ct. 2107, 18 L.Ed.2d 1316; Corruth Publications v. Wesberry, 1967, 388 U.S. 448, 87 S.Ct. 2096, 18 L.Ed. 2d 1310; Avansino v. New York, 1967, 388 U.S. 446, 87 S.Ct. 2093, 18 L.Ed.2d 1308; Sheperd v. New York, 1967, 388 U.S. 444, 87 S.Ct. 2093, 18 L.Ed.2d 1306; Cobert v. New York, 1967, 388 U.S. 443, 87 S.Ct. 2092, 18 L.Ed.2d 1305; Chance v. California, 1967, 389 U.S. 89, 88 S.Ct. 253, 19 L.Ed. 256; Henry v. Louisiana, 1968, 392 U.S. 655, 88 S.Ct. 2274, 20 L.Ed.2d 1343; Mazes v. Ohio, 1967, 388 U.S. 453, 87 S.Ct. 2105, 18 L.Ed.2d 1315.

consider the use that was actually intended, not its possible use for remedial purposes. In determining this, we may consider not only that the publications were intended for commercial sale but also the methods that were used to display them. Ginzburg v. United States, 1965, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31. Here the material is offered for sale to any adult buyer having the purchase price, not only to therapists and educators. The covers of the publications pander to the prospective purchaser. They are not offered to educate or to enlighten; they are intended to titillate. See Childs v. Oregon, 9 Cir. 1970, 431 F.2d 272.

■ This is a criminal prosecution for transportation of the materials in interstate commerce, not a civil proceeding against the materials themselves. Cf. United States v. Language of Love, 2 Cir. 1970, 432 F.2d 705. As the Supreme Court has noted, a criminal conviction on the theory of *Ginzburg* "does not necessarily suppress the materials in question, nor chill their proper distribution for a proper use." 388 U.S. at 475, 86 S.Ct. at 949. Applying the *Memoirs* three-way test to the particular interests involved in this specific case, these materials are not protected by the Constitution.

## II. VOID FOR VAGUENESS

■ Defendants next assert unconstitutionality of the statutes themselves as violating the First, Fourth, Fifth and Sixth Amendments to the Constitution, because they forbid the doing of acts in terms so vague that men of common intelligence must necessarily guess at their meaning and differ as to their application; and because they set forth no standards and hence unnecessarily and broadly invade the right to Freedom of Speech protected by the First Amendment; because they lack a definition of what is obscene and because they are susceptible of sweeping and improper application by law enforcement officers.

In *Roth*, in 1957, the United States Supreme Court for the first time reviewed and affirmed a conviction under a related statute, 18 U.S.C. § 1461, dealing with the use of the mails to transport obscene materials. It upheld the constitutionality of that statute. Again in 1966, in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31, the Court affirmed a conviction under the use of the mails statute without discussing its constitutionality. In United States v. Alpers, 1950, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457, the court upheld a conviction under the statute involved here without expressly considering its constitutionality. In Redmond v. United States, 1966, 384 U.S. 264, 86 S.Ct. 1415, 16 L.Ed.2d 521, the Court vacated a judgment of conviction for violating the mails statute on motion of the Solicitor General because the prosecution there for mailing private correspondence containing allegedly obscene matter was not in accordance with Department of Justice policies. Justices Stewart, Black and Douglas concurred, "not because [this conviction] violates the policy of the Justice Department, but because it violates the Constitution."

The statute here involved and the use of the mails statute, in principle indistinguishable, have thus been subject to possible constitutional review by the Supreme Court at least four times. The question whether the term "obscene" lacks identifiable content is the very subject of the opinion in *Roth*. That case holds that the statute is not unconstitutionally vague in its designation of what materials may not be transported. The Court then adopted, and since has consistently applied, an approach to the obscenity question in which the issue is not the invalidity of statutory provisions on their face, but whether the provisions are invalid as applied. E. g., Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31; A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1; Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed. 515; Note, The First Amendment Overbreadth Doctrine, 83 Harv.L. Rev. 844, 884–887, 921–922 (1970).

Thus, the defendants' vagueness argument is rejected.

## III. DOES THE STATUTE VIOLATE THE FIRST OR FOURTEENTH AMENDMENT?

Until recently, it appeared that *Roth* and the other obscenity cases were premised on a two-level theory of speech. "There are certain well-defined and narrowly limited classes of speech, the prohibition of which has never been thought to raise any Constitutional problem. These include the lewd and the obscene." 315 U.S. at 571. See, also, Ginsberg v. New York, 1968, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195; Jacobellis v. Ohio, 1964, 378 U.S. 184, 186, 84 S.Ct. 1676, 12 L.Ed.2d 793. A perceptive scholar has suggested that the *New York Times* decision, New York Time v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, undermined the two-level rationale, and, "Obscenity, too, it would seem, can claim no talismanic immunity from constitutional limitations." Kalven, The New York Times Case: A Note on the Central Meaning of the First Amendment, 1964 Sup.Ct.Rev. 191, 217. Nonetheless, even after *New York Times*, the court has withheld the protection of the First Amendment from obscene material. Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31.

The defendants contend that the Supreme Court's decision in Stanley v. Georgia, 1970, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 rejects the two-level analysis for an interest balancing approach: *Roth*, they argue, is now viewed in a different light.

* * * "*Roth* and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity. But the assertion of that interest cannot, in every context, be insulated from all constitutional protections. Neither *Roth* nor any other decision of this Court reaches that far. As the Court said in *Roth* itself, '[C]easeless vigilance is the watchword to prevent * * * erosion [of First Amendment rights] by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests.' 354 U.S., at 488, 77 S.Ct., at 1311. *Roth* and the cases following it discerned such an 'important interest' in the regulation of commercial distribution of obscene material. That holding cannot foreclose an examination of the constitutional implications of a statute forbidding mere private possession of such material." 394 U.S. at 563, 564, 89 S.Ct. at 1246.

The defendants assert that the "right to receive" obscene materials recognized in *Stanley* denotes a societal interest sufficient to keep the door "tightly closed" against regulation of the sale or transportation of such material, at least where the material is not publicly displayed or shown to minors. Some federal courts have adopted this view of *Stanley*. United States v. Lethe, E.D.Cal.1970, 312 F.Supp. 421, declaring unconstitutional one of the statutes dealing with mailing obscene material; United States v. Luros, C.D.Cal.1970, declaring the statute prohibiting importation of obscene material unconstitutional. See also Karalexis v. Byrne, D.Mass.1969, 306 F.Supp. 1363, and Stein v. Batchelor, N.D.Tex. 1969, 300 F.Supp. 602. And so have some commentators. Katz, Privacy and Pornography: Stanley v. Georgia, 1969, S. Ct.Review 203. Engdahl, Requiem for Roth: Obscenity Doctrine is Changing, 1969. 68 Mich.L.Rev. 185. But compare Gegan, The Twilight of Nonspeech, 1969, 15 Catholic Lawyer 210; Eads, Stanley v. Georgia: A Private Look at Obscenity, 1969, 21 Baylor L.Rev. 503; Karre, Stanley v. Georgia: New Directions in Obscenity Regulation? 48 Texas L.Rev. 646.

I do not agree. *Stanley* involved a prosecution for violation of a state statute prohibiting "knowingly having pos-

session of * * * obscene matter." The defendant, there, had possessed a movie film that was discovered by police while searching for evidence of gambling activity. The Supreme Court's opinion made it clear that a combination of Fourth Amendment interests against "unwanted governmental intrusions into one's privacy" 394 U.S. at 564, 89 S.Ct. at 1248 and First Amendment interests against "control [over] the moral content of a person's thoughts." Id. at 565, 89 S.Ct. at 1248, overcame the "valid governmental interest in dealing with obscenity." Id. at 563, 89 S.Ct. at 1246. Though the rationale was impaired, the result in *Roth* was specifically upheld. It was noted that *Roth* and its progeny had dealt "with the power of the State and Federal Governments to prohibit or regulate certain public actions taken or intended to be taken with respect to obscene matter." (Id. at 561; see, also, id. at 563–564, 566, 89 S.Ct. at 1246) Public distribution was thus distinguished from private possession. The majority concluded that *"Roth* and the cases following that decision are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home" (*id.* at 568, 89 S.Ct. at 1249).

Thus, the court did not hold in *Stanley* that society's interest in the right to receive could, alone, outweigh all governmental interests in regulating the distribution of obscenity to consenting adults. "The right to receive information and ideas" may be satisfied in other ways than by resort to commercial distributors who purchase from producers in other states. Thus it has been held that society's interest in the privacy of personal correspondence is sufficient to preclude the obscenity conviction of an individual engaged in "swapping" pornographic films with acquaintances. United States v. Dellapia, 2 Cir. 1970, 433 F.2d 1252. The added interest in regulating wide-spread, inter-state commercial distribution networks is sufficient, however, to permit these statutes to stand.[7]

A few courts have already held that *Stanley* did not imply that the constitutional right to possess obscene matter privately prevents the Congress from forbidding the transportation of such material for the purpose of public sale. United States v. Melvin, 4 Cir. 1969, 419 F.2d 136; supplemental opinion in United States v. Fragus, 5 Cir. 1970, 428 F. 2d 1211; see, also, Gable v. Jenkins, N.D. Ga.1969, 309 F.Supp. 998.

 Assuming that *Stanley* precludes regulation of the interstate transportation of noncommercial pornography and that the literal terms of the statute would prohibit this act, the defendants here may not challenge the statute on the ground that it is overbroad. The Supreme Court has often permitted one whose conduct is not, itself, protected to challenge overbroad statutes that inhibit the exercise of First Amendment activities. E. g. Thornhill v. Alabama, 310 U.S. 88, 96–98, 60 S.Ct. 736, 84 L.Ed. 1093; Dombrowski v. Pfister, 380 U.S. 479, 490–492, 85 S.Ct. 1116, 14 L.Ed.2d

---

7. In view of the decision reached on other grounds, it is unnecessary to reach the defendants' argument that the sole basis for the statute is to legislate morality and that this is beyond Congress' powers. In respect to that argument, however, it may be noted that, in the exercise of the powers given it by the Constitution, Congress does have a legitimate concern with morality as well as public order. Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031. The Nation and the States have a right "to maintain a decent society." See dissent of Chief Justice Warren in Jacobellis v. Ohio, 1964, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793. Hence when, for example, Congress prohibits the use of the mails to defraud, it may act because fraudulent conduct is immoral, disturbs societal order, and leads to an undesirable kind of social conduct, and not merely because the person who is the victim loses money thereby. The powers of Congress are not circumscribed by the kind of compulsion toward restitution that lies behind some state bad check laws.

22; see generally, Stedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962). This permits a more rapid elimination of the offending law. When, however, Courts can articulate a rule that excises most of the overbreadth and eliminates much of the chill, an expansive approach to standing is unnecessary to protect First Amendment Interests. Note, the First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 907–910; cf. Dombrowski v. Pfister, 380 U.S. 479, 491, 85 S.Ct. 1116, 14 L.Ed.2d 22. Judicial consideration of successive applications of the statute is then sufficient.

The commercial-noncommercial test is one that has performed this service in other areas of the law. See Murdock v. Pennsylvania, 1943, 319 U.S. 105, 63 S. Ct. 870, 87 L.Ed. 1292. Thus, even if the view that interstate transportation of noncommercial pornography is protected be correct, the defendants may not raise it in this case. "[W]hen a line of excision is available, one standing within the zone which a truncated statute might reach may be barred from setting up the statute's overbreadth as to others." [8]

For these reasons, I do not think that *Stanley* overrules *Roth,* or that the United States has failed to demonstrate a substantial and proper governmental interest.

## IV. DOES THE STATUTE DENY PROCEDURAL DUE PROCESS BY FAILING TO REQUIRE PRIOR ADVERSARY HEARINGS?

The statutes also deny the defendants due process of law, it is contended, because they do not require sufficient safeguards to assure non-obscene materials the constitutional protection of the First Amendment. This is a mere restatement of the argument that the defendants should have had a prior adversary hearing before the offending materials were seized. If such a hearing is required, it is mandated by the First, not the Fifth, Amendment. See Monaghan, First Amendment "Due Process", 83 Harv.L.Rev. 518 (1970).

There can be no doubt that the bulk of authority supports the defendants' position where evidence is seized pursuant to search warrants issued based on a description of the materials. See the cases cited in United States v. Alexander, 8 Cir. 1970, 428 F.2d 1169. But, as that case points out, in granting a motion to suppress "a number of methods for the securing of evidence remain available to prosecutors." 428 F.2d at 1176. Thus, in that case where there was a "wholesale seizure" under a warrant, the materials were ordered returned without prejudice to a requirement that one copy of each title be delivered to the government by its owner for use in connection with criminal prosecutions. For the reasons set forth in the motion to suppress (dealing with the seizure of the motion picture film), the seizure here of one copy of each of the seventeen publications to be used as evidence in a criminal prosecution without other seizures and without disruption of the defendants' business activities, is not unconstitutional.

## V. DOES THE STATUTE INVADE STATE'S RIGHTS?

The purveyors of these photographs also defend the right of the states alone to prohibit their conduct. If there is a legitimate state interest in forbidding commercial distribution of these materials, Congress may forbid the use of channels of interstate commerce to subvert state policy. See Clark Distilling Co. v. Western Maryland R. Co., 1917, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (Webb-Kenyon Act).

## VI. ARE THE INDICTMENTS DEFECTIVE?

The alleged defects in the indictments lie in their suggested failure to provide a sufficient description of the materials contended to be obscene; in their failure to name the persons "to whom the defendants are alleged to have

---

8. Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 909.

transported" the publications; and in their failure to charge the defendants with *scienter* or knowledge of the obscene character of the publications. Insofar as these arguments are predicated on the notion that the term "obscene" lacks sufficient meaning, they have already been dealt with. Beyond that, it is not fatal that the indictment fails to name the publications involved or to whom they were sent. The United States has supplied this information to the defendants so that they can adequately prepare their defense.

## VII. DID THE GRAND JURY HAVE ENOUGH EVIDENCE TO IN-DICT?

Defendants argue that the grand jury could not determine the obscenity of the publications without factual evidence of the violation of the three tests imposed by *Memoirs* and without proper legal instructions. It is not denied that the grand jury saw the publications and formed its own judgment of their obscenity. That is enough.

For the reasons assigned, the motions are denied.